## Von Schmidt *et al. vs.* Huntington *et al.*

Under the Mexican law, which formerly prevailed in this country, the proceeding of *conciliacion* was necessary, before the institution of a suit in one of the *ordinary* courts; and *it seems* that it was the proper and regular proceeding to be taken, even since the acquisition of the country by the Americans. The want of it, however, is to be regarded but as a formal and technical defect, which this court, on appeal, is authorized to disregard by the statute of February 28th, 1850, and the court will not reverse a judgment merely because the formality of *conciliacion* has not been gone through with before the commencement of the suit.

If *conciliacion*, however, had been necessary to confer *jurisdiction* upon the *ordinary* judge, it would have been a fatal defect, which could not be overlooked, or disregarded even on appeal.

In what cases *conciliacion* was necessary under the Mexican law, and in what cases unnecessary, considered. *Per* BENNETT, J.

Since the occupation of California by the Americans, the proceeding of *conciliacion* has been deemed a useless formality by the greater portion of the members of the bar, by the courts, and by the people. *Per* BENNETT, J.

Under the Mexican law, custom is sometimes allowed not only to control, limit, modify and interpret the general rules of the system, but even to establish a rule in direct contravention of the positive written law. Thus, custom may attain the force of law, not only when there is no law to the contrary, but when the effect of it is to overturn the previous law which stands in opposition to it. *Per* BENNETT, J.

A statute should be construed so as to take effect upon future, and not upon past transactions; but with the exception of cases within prohibitory clauses, in state constitutions or in the constitution of the United States, it is competent for a state legislature to give to a statute a retro-active effect.

As a general rule, all persons materially interested in the subject matter of a suit ought to be made parties; but where the parties in interest are numerous, a court will allow a suit to be brought by some of them in behalf of themselves and others, taking care that there shall be a due representation of all substantial interests before the court. Thus, where the stock of a joint stock company was divided into money shares and labor shares, and certain holders of the latter description of stock brought suit against certain holders of the former description of stock, without all the persons of either class being made parties; *Held*, The stockholders being numerous, and it being difficult, if not impracticable, to bring them all into court, that the parties before the court were sufficient to authorize it to adjudicate upon their rights, and dissolve the company, and decree a distribution of its effects.

Where a chancery suit is heard on bill and answer, all the allegations in the answer, whether upon knowledge or upon information and belief, are to be taken as true. If the complainant wishes to dispute any of the allegations in the answer, he

must file a replication, and thus enable the defendant to establish them by proof if he can.

Contracts, like statutes, under which a forfeiture is claimed to have accrued, should be construed strictly, and the facts urged in support of the forfeiture ought to be clear and explicit, and not be left to inference and argument.

A *joint-stock association* formed for a definite period cannot be *voluntarily* dissolved, except by the unanimous consent of all the stockholders; if such consent cannot be had, then application must be made to a court to decree a dissolution.

A joint stock association was formed in the city of New York, called the New York Union Mining Company, for the purpose of prosecuting the business of mining in California, and the period during which the company was to continue the business was, by the articles of association, to be from January 1, 1849, to October 1, 1853, with a prohibition against dissolution within one year after the arrival of the company in California, except on certain conditions, which had not been complied with. *Held*, That a portion of the company could not, contrary to the articles of association, dissolve the company at their will and pleasure; but, it being found impracticable to keep the company together, or to prosecute successfully the contemplated enterprise, under the articles of association, the court decreed a dissolution and the distribution of the effects of the company.

The stock being divided into money shares and labor shares, the holders of the latter of which had contributed no capital towards the outfit of the company, had performed no labor beneficial to the company, and had their expenses to California paid out of the funds contributed by the holders of the money shares; *Held*, That the assets of the company should be distributed among the holders of the money shares alone.

Von Schmidt, one of the plaintiffs, having failed to join the company within a reasonable time, *it seems* that his labor stock became forfeited under one of the clauses in the articles of association, which declared *absence without leave* to be a cause of forfeiture, and the other plaintiffs having deserted the company; *Held*, That a resolution of the company declaring their money shares, as well as labor shares, to be forfeited, was valid under the articles of association.

It being for the interest of all parties concerned that the company should be legally dissolved; *Held*, That the costs and a counsel fee, on each side, should be paid out of the fund.

THIS was an appeal from a decree of the court of First Instance of the district of San Francisco. The facts of the case are sufficiently stated in the opinion of the court. The cause was argued in this court by

*John W. Dwinelle,* for plaintiffs, and

*Hall McAllister,* for defendants.

Von Schmidt *v.* Huntington.

*By the Court,* BENNETT, J. The parties to this suit, plaintiffs and defendants, in conjunction with others, formed a company in the city of New York, in the early part of the year 1849, under the name of the New York Union Mining Company. Articles of association were adopted, which declare that the persons whose names are subscribed thereto, agree to associate themselves for the purpose of prosecuting the business of mining in California, from the 1st day of January, 1849, until the 1st day of October, 1853 ; and that the company shall consist of not less than twenty-nine operative or working shareholders, who are required to devote their entire time and energies to promote the common interest in such manner as the company shall direct. In addition to various other officers, there was a finance committee provided for, consisting of the treasurer and two other operative shareholders, whose duty it was to take charge of the fiscal affairs of the company. The defendants constituted this finance committee, and the complainants were operative shareholders.

The stock of the company consisted of 338 shares of $250 each, making an aggregate of $84,500. Each operative shareholder was entitled to eight shares, or $2,000 of the stock, and was required, in addition thereto, to subscribe and pay for not less than two other shares. The residue of the stock, being 48 shares, was taken in part by operative shareholders, and in part by persons not otherwise connected with the company. Thus, the whole stock of the company was divided into two distinct species—the one of 232 shares was denominated labor stock, and the other, of 106 shares, was denominated money stock. The articles further provided, that on the 1st day of October, in the year 1853, a meeting of the stockholders should be held in California, at which it was to be determined by a vote of a majority whether the company should continue another year, and the terms upon which it should be continued. There was a number of other regulations, and article 22 was in the following words : " Any operative shareholder, who shall absent himself " during any portion of the time hereby limited, without leave, "or providing a proper substitute, unless relieved by a vote of "a majority of the operative shareholders for good cause as-

" signed, shall forfeit his interest in the labor stock of the com-
" pany ; and any operative shareholder who shall, within three
" months after the arrival of the company in California, desert
" the company without leave, shall, in addition to his labor
" stock, forfeit his two shares of money stock."    Other articles,
so far as they are of importance in this suit, will be noticed
hereafter.

The company arrived in California about the 1st of Septem-
ber, 1849.   Peter Von Schmidt, one of the plaintiffs, arrived
ten days after, and the other  plaintiffs about three  months be-
fore that date.   Previous to the arrival of Peter Von Schmidt,
the company had held a  meeting, and  had expelled him and
the other plaintiffs from the company, and declared both their
labor and money stock forfeited.   On the 26th day of Novem-
ber last, the plaintiffs filed this bill to compel the company to
reinstate them, alleging that it was found impracticable to keep
the company together, that their labors as a company could
have no profitable results, that a dissolution had been resolved
upon and declared, that a part of the property had been sold,
and that all the residue had been advertised for sale at auction.
The bill also alleged that the defendants had been directed by
the company to make a dividend of the proceeds of the sales,
upon the 232 shares of labor stock, equally with the 106 shares
of money stock.   The bill prays, in substance, for a decree that
the proceeds arising upon the sale of the company's property
be distributed amongst the money shares alone, and that the
plaintiffs be relieved from the forfeiture of the stock incurred
or pretended to have been incurred by them, so that they may
receive their dividends, together with the other members, upon
all the money shares which they had bought.   The bill also
prays for an injunction and the appointment of a receiver, but
contains no express prayer for a dissolution of the company.

The defendants put in a plea in which it is alleged that the
plaintiffs had not brought into court any certificate of failure
of *conciliacion* between the parties.   The plea was overruled
by the court below, whereupon the defendants put in their an-
swer, the material portions of which will be hereafter noticed.

Von Schmidt v. Huntington.

The cause was heard on bill and answer, and a decree was made in the court below, restoring the plaintiffs to their forfeited rights, appointing a receiver, and directing a distribution of the effects of the company equally upon the labor and the money shares. From this decree the appeal is taken by the defendants.

The first point which we propose to examine in reviewing the positions of counsel, is that relating to *conciliacion*. Although this point has been frequently made heretofore, it has not been found necessary in the disposition of any case for the court to express its views upon the subject; but it is now presented in the formal shape of a dilatory exception, put in at the very outset of the proceedings, which we apprehend to be the proper, if not the only method of bringing the question regularly before the court. (1 *White's Recopilacion*, 259, 260, *and* 383; *Escriche Dic. Title*, "*Excepcion*.") Being thus an objection *in limine*, taken in due time and in the appropriate form, it must, if valid, put an end to the whole case; if not valid, it must, nevertheless, be disposed of before the other points of the case can be reached.

The proposition naturally resolves itself into two subdivisions. First, that *conciliacion* is required in this case by the Mexican law; and secondly, that being essential by the Mexican law, it has not been legally dispensed with since the American administration of justice in this country commenced.

First, then, is *conciliacion* required in such a case as the present by the Mexican law? It is provided by article 40 of the 5th Title (*ley*) of the Mexican Constitutional Law, that in order to the due institution of any suit whatsoever, either civil or criminal, for wrongs purely personal, the means of *conciliacion* must be first tried; and that the law will regulate the form of proceeding in such matters, the cases in which *conciliacion* need not take place, and everything else relating to the subject; and by article 29 of the 6th title it is declared, that it will be the province of alcaldes to exercise within their *pueblos* the functions of conciliators.

The Mexican decree of May 23d, 1837, which was made in

pursuance of the above requirements of the Constitution, and which is generally supposed to have been in force in California at the time of the acquisition thereof by the American government, says, that it belongs exclusively to the alcaldes of the Ayuntamientos, and to the justices of the peace in places whose population consists of one thousand persons or more, to exercise within their territory, in respect to all classes of persons, without any exception, the functions of conciliators, according to the above provisions of the constitution. (*Arrillaga's Colleccion de Decretos of* 1837, *p.* 422, *Escriche Dic. Appendix, p.* 703, *Ed.* 1842.) It is there provided, that in order that the proceeding of *conciliacion* may take place, whosoever may have to institute any civil suit. the value of which exceeds one hundred dollars, or any criminal suit for severe injuries purely personal, shall make his complaint before the competent alcalde or justice of the peace, demanding, verbally, that the person who is to be made defendant be summoned, in order to proceed in the trial of *conciliacion.* (*See authorities last above cited.*) Article 10 ordains that no complaint, either civil or criminal, concerning injuries purely personal, can be admitted, without proving by a competent certificate that the means of *conciliacion* have been attempted. (*Arrillaga's Colleccion,* 1837, *p.* 419, *and Escriche as above cited.*) After excepting from the operation of article 10 various cases relating to benefices and other ecclesiastical matters, causes which concern the public revenue, the municipal funds of towns, public institutions, and other matters not affecting the case at bar, article 11 proceeds as follows: "Neither is it (*conciliacion*) necessary in order to commence the summary and very summary possessory actions, "that of the prohibition of a new work, or that of retraction; "nor in order to expedite the making of inventories and the division of inheritances, nor in other urgent cases of like nature; but if a formal petition should afterwards have to be "put in, which may give rise to a litigated suit, then *conciliacion* "ought to precede it." The same article, after again excepting certain cases of bankruptcy, closes with a general clause requiring *conciliacion,* "whenever any citizen may have to de-

"mand, by due course of law, the payment of a debt, even though "it accrue upon a contract of record." (*Arrillaga and Escriche, as above cited.*) This statute appears to have been only a revision of previous statutes, and but declaratory of a long established law, for we find the same doctrine laid down by *Febrero* (4 *Feb. Mej.* 420, *et seq. ed.* 1834), and by Peña y Peña. (1 *Prac. For. Mej.* 70, *ed.* 1835.) Indeed, its origin is to be traced far back, even to the period of the *Nueva Recopilacion*, in which it is declared, in speaking of the duties of judges, that they shall discourage litigation, as far as in them lies, by using their endeavors to induce parties to compose their differences voluntarily and in a friendly manner, by refusing legal process in cases of a trivial nature, whenever it can be done without prejudicing the lawful rights of the parties; and by making use of persuasion, and all other means which their discretion shall dictate, to convince the parties of the benefit which will result to them from a composition of their differences, and the damage and expense inseparable from litigation, even when accompanied with success. (4 *Feb. Mej.* 420; 1 *Prac. For. Mej.* 72, and see also 5 *Tapia Feb.* 209, 213.) It thus appears to be the policy, not only of the Mexican statute above referred to, but also of the Spanish and Mexican law, in all cases of a civil nature, which are susceptible of being completely terminated by the agreement of the parties, to require conciliatory measures to be tried until they shall result either in a satisfactory arrangement or in the entire failure to accomplish a reconciliation. In the latter event, and in that event only, are the parties allowed to resort to the regular and formal mode of litigation in the ordinary courts.

This being the general rule, *conciliacion* was necessary, under the Mexican statute in the case before us, unless it may be brought within some of the exceptions enumerated in that statute. Does it fall within any of those exceptions? It is not a verbal process, nor does it concern any benefice or other ecclesiastical matter, nor the public revenue, nor the municipal funds of towns, nor public institutions, nor minors, nor persons deprived of the administration of their property, nor vacant

inheritances, nor taxes, contributions or imposts. It belongs to neither of the three classes of possessory actions, nor interdicts of possession; it is not the denouncement of a new work, nor a proceeding called a retraction, nor a case of bankruptcy, to which it was endeavored to be assimilated upon the argument; it has no relation to inventories of the estates of deceased persons, nor to the division of any inheritance between heirs, legatees, or devisees. It must fall, if it may be brought within any of the exceptions, under the general terms of that clause of the statute, which, together with inventories and division of inheritances, also excepts " other urgent cases of the like nature." We should think that it might properly arrange itself under these general words, were it not for the clause immediately succeeding, which requires *conciliacion* previous to preferring a formal petition, which may have the effect of occasioning a litigated suit, and in cases where a party has to seek by process of law the payment of a debt, even though the claim be based upon a contract of record. But in order to attain the end prayed for in the bill of complaint, it was necessary that a formal petition should be filed, which might have the effect of giving rise, and which has actually given rise, to a litigated suit.

It is to be observed that, with the exception of those cases relating to ecclesiastical matters, the public revenues either of cities or of towns, and certain other subjects of a political character, and affecting the public welfare, all of which stand upon peculiar grounds of their own, the cases in which the preliminary effort at *conciliacion* is dispensed with, are those in which some step is necessary to be immediately taken, in order to protect temporarily the rights of the party complaining, or to prevent some injury threatened to his property; but that in none of the cases are the claims of the parties to the subject matter in contest finally and absolutely adjusted. They are all in the nature of incipient or introductory proceedings for the purpose of procuring from the court an interlocutory order or decree, determining the temporary possession, control, or situation of the property, previous to the parties entering upon a full and formal investigation of their rights concerning it.

Von Schmidt *v*. Huntington.

Thus the summary and very summary interdicts of possession are instituted in order to enable the party complaining to acquire, retain, or recover simply the possession of the thing in controversy, until the title to it can be settled finally by the adjudication of the court in an ordinary suit. (1 *Feb. Mej.* 351; 4 *Id.* 272; *Tapia's For. Prac.* 233, 234, *ed.* 1829.) They partake somewhat of the nature of injunctions in courts of equity, and are applied to similar purposes, that is to say, to restrain the undue exercise of rights, to prevent threatened wrongs, to restore violated possessions, and to secure the peaceable and quiet enjoyment of property. (2 *Story's Eq. Juris.* 201 *to* 204.) The denouncement of a new work, being a proceeding to restrain the erection of some new work, as for instance a building, which may, if completed, injuriously affect the property of the complainant, is of a character similar to the interdicts of possession. (4 *Feb. Mej.* 277 *et seq.*; *Escriche Dic. Title* " *Denuncia de Obra Nueva*," *p.* 185.) And in the case of retraction, or the rescinding of a sale upon the claim of the plaintiff to be allowed to take the property at the same price for which it was sold to a third person, although certain steps may be taken for the security of the property previous to *conciliacion*, yet, if the vendee, on his appearance before the judge, resists the claim of the plaintiff, then a litigated suit becomes necessary, which must be preceded by the trial of *conciliacion*. (3 *Feb. Mej.* 75.) It follows from the above view of the nature of those cases which do not require attempts at *conciliacion*, that suits known in the American system of jurisprudence as injunction suits, not praying for relief further than to restrain the defendant from the performance of a specific act, would not, as a general thing, require *conciliacion* under the Mexican system; and if the object of this suit had been simply to prevent the threatened sale of the property of the company, without praying for a final disposition and settlement of its affairs, and distribution of its effects, we should have thought that it was one of those urgent cases contemplated by the statute in which *conciliacion* might have been dispensed with. But before any step could have been taken to obtain the extent of relief prayed

Von Schmidt *v.* Huntington.

for by this bill, we apprehend that it was an essential prerequisite that conciliatory measures should have been tried, within that portion of the statute which makes *conciliacion* necessary in those cases in which a formal petition is to be put in, which may occasion a litigated suit.

*Conciliacion*, then, having been necessary in this suit under the Mexican statute, we come next to the second subdivision of the point under discussion, which is, whether this case can claim any legal dispensation from the effects of that statute.

It is claimed that a certificate of the failure of *conciliacion* must be presented in order to confer jurisdiction upon the court. If this be so, the judgment appealed from is utterly null, and we know of nothing which can give it validity. The ground of nullity is assumed by many, if not most, of the writers upon the subject, but the latest authority which we have seen holds the reverse, and the views contained therein are satisfactory. (5 *Tapia Feb.*, 215, 216, *ed.* 1845.) The proceedings, therefore, although irregular under the statute, are not void for want of jurisdiction ; and the question then is, whether that irregularity may in any way be cured?

This question might, perhaps, be satisfactorily answered by saying, that since the acquisition of California by the Americans, the proceeding of *conciliacion* has, in all cases, been deemed a useless formality by the greater portion of the members of the bar, by the courts and by the people ; that it has, in fact, passed into disuse and become obsolete. In Mexican jurisprudence, as in that of other countries, custom is sometimes allowed not only to control, limit, modify, and interpret the general rules of the system, but even to establish a rule in direct and palpable contravention of the positive written law. It is the teaching of the books that custom may attain the force of law, not only when there is no law to the contrary, but when the effect of it is to overturn the previous law which stands in opposition to it—whence arises the maxim, that there may be a custom without law, a custom contrary to law, and a custom according to law. (*Escriche, Derecho Español*, 23, 24 ; *Escriche, Dic. Title "Costumbre ;"* 1 *Feb. Mej.* 55 to 61.)

Von Schmidt v. Huntington.

But it is unnecessary to base our conclusion upon the ground of custom. Section 26 of the act of February 28th, 1850, regulating appeals, authorizes this court to reverse, affirm, or modify any judgment, order, or determination appealed from, in whole or in part, and as to any or all of the parties, to grant new trials, and render such judgment as substantial justice shall require, without regard to formal or technical defects, errors, or imperfections, not affecting the very right and justice of the case. Notwithstanding the importance which seems to be attached to the trial of *conciliacion* by Spanish and Mexican writers, (*see* 5 *Tapia Feb.* 209, *and* 1 *Prac. For. Mej.* 72 *et seq. by Peña y Peña*,) and even conceding that it may operate beneficially in the nations for which it was originally designed, still, amongst the American people it can be looked upon in no other light than as a useless and dilatory formality, unattended by a single profitable result, and not affecting the substantial justice of any case. Viewing, then, the absence of a certificate of the failure of *conciliacion* as a mere formal and technical defect, error or imperfection, we feel ourselves fully justified in overruling the objection founded upon it. Nor does it strike us that there is any force in the argument that the statute of February 28th ought not to be construed so as to give it a retro-active operation. As a general rule of statutory interpretation, it is undoubtedly true that a statute should be construed to operate upon the future, and not upon the past; but, with the exception of those cases which come within the purview of prohibitory clauses in state constitutions, or in the constitution of the United States, we know of no case in which it is not competent for a state legislature to give to a statute a retro-active effect; and it is the very scope and object of the statute of February 28th to provide for the decision upon appeal of cases which had been tried previous to its passage.

We have entered thus fully into an examination of the doctrine of *conciliacion*, and given our views of it at length, in order that the profession may understand, that the objection for the want of conciliatory measures is, so far as the court is concerned, disposed of now, and, as we sincerely hope, forever.

The next point to be considered is as to parties. It is claimed by the counsel for the appellants that the bill should be dismissed for defect of parties. The general rule upon this subject is sometimes stated to be, that all persons materially interested in the subject matter of the suit ought to be made parties, and sometimes it is limited to those who are interested in the object of the suit. But whether the one definition or the other be adopted, in neither case is the rule founded on any positive and uniform principle, nor admits of being expounded by the application of any universal test. It can scarcely be said to be useful as a practical guide, for it is open to so many exceptions, and qualifications, and limitations, that the nature, extent and application of it cannot be always clearly defined. The principle upon which these exceptions are founded is, that courts will not suffer the rule to be so applied as to defeat the very purposes of justice, if they can dispose of the merits of the case before them without prejudice to the rights or interests of other persons who are not parties, or if the circumstances of the case render the application of the rule impracticable. (*Story's Eq. Pl. sec.* 76, 77.) One exception is, where a person is beyond the jurisdiction of the court (*id.* 78,) which would apply, to some extent, to the case in hand, for it is conceded that some of the money shareholders of the company are not within the state. Another exception is, where the persons interested are numerous, and it would be impracticable to join them without almost interminable delays, and other inconveniences which would obstruct and probably defeat the purposes of justice; neither is the general rule adhered to in cases in which, consistently with practical convenience, it is inapplicable, for then it would destroy the very purposes for which it was established. Where the question is one of a common or general interest, or where parties form a voluntary association for public or private purposes, the persons interested are commonly numerous, and any attempt to unite them all in the suit would be, even if practicable, exceedingly inconvenient, and would subject the proceedings to the danger of perpetual abatements and other impediments, arising from intermediate deaths or other accidents

or changes of interest. (*Story's Eq. Pl. sec.* 93, 96, 97.) Many adjudications, in which these principles have been applied and illustrated, are collected and arranged by Judge Story in his work on equity pleadings, the result of which is, that where the parties in interest are numerous, courts will allow a bill to be brought by some of them on behalf of themselves and others, taking care that there shall be a due representation of all substantial interests before the court; and no distinction is made whether the bill be filed by or against persons not members of the association, or by certain members against others of the same association. It is true that it has been held in some of the cases that where the bill seeks the dissolution of the company, all the members must be made parties, however numerous they may be, but this doctrine has been greatly qualified if not positively overturned in the more recent authorities; and the reasons against its application advanced by Judge Story, (*Eq. Pl. sec.* 134, 135,) are so cogent and conclusive, that, even if express authority did not support us, we could not hesitate, in establishing a precedent in a new state, to declare that it receives our unqualified dissent. We would in this respect take for our guide the wisdom of Lord Cottenham declared in *Taylor* v. *Salmon*, (4 *Mylne & Craig's Rep.* 134,) that " it is the duty of " the court to adopt its practice and course of proceeding as far " as possible to the existing state of society, and to apply its juris- " diction to all those new cases, which from the progress daily " making in the affairs of men, must continually arise, and not, " from too strict an adherence to forms and rules established " under very different circumstances, decline to administer jus- " tice and to enforce rights for which there is no other remedy." Upon the whole, the 48th rule of the supreme court of the United States, adopted in 1842, appears to furnish the correct rule for the government of cases of this nature, which is, that where the parties on either side are very numerous and cannot, without manifest inconvenience and oppressive delays in the suit, be all brought before it, the court, in its discretion, may dispense with making all of them parties, and may proceed in the suit, having sufficient parties before it to represent all the

adverse interests of the plaintiffs and the defendants in the suit properly before it.

Although the bill of complaint, in the case before us, does not expressly allege, that it is filed on behalf of the plaintiffs and others claiming the same interest in the effects of the association; it appears, nevertheless, to be the scope of the bill to protect the rights not only of the plaintiffs but also of another numerous class of the stockholders, who are owners of what is termed the money shares; for the bill prays that the proceeds arising from the sale of the effects of the company may be divided amongst all the money shares and the money shares alone. Whilst, therefore, the plaintiffs may properly be deemed to represent the money stockholders, the defendants, who insist that the property of the company should be distributed amongst the money and the labor shares equally, may be regarded as peculiarly representing the labor shares; and thus all the substantial interests of all the members of the company are before the court. The persons interested in the subject matter of the suit are numerous, and from the nature of the enterprise which was the object of the formation of the company, from the condition of the country and the ever changing locations of people engaged in operations in the gold mines of California, it would be, if not utterly impracticable, productive of manifest inconvenience and oppressive delays, to require that all the members of the association should be brought into court before it would proceed to administer justice between any of them. We think that the bill ought not to be dismissed for defect of parties.

Before proceeding to the consideration of the other points raised, it becomes necessary to determine what effect should be given to the allegations of the answer. It is claimed by the counsel for the plaintiffs, that while the matters stated upon the knowledge of the defendants are to be taken as true, those matters which rest upon information and belief are entitled to no weight. We understand the rule very differently. The case has been treated by both parties strictly as a chancery suit,—the subject matter is properly of chancery jurisdiction—the plead-

Von Schmidt *v.* Huntington.

ings are formal chancery pleadings—and the cause was passed upon by the court below as a chancery cause and was argued as such in this court. The effect of the answer must therefore be governed by the rules of chancery practice, according to which, when a cause is heard on bill and answer, all the material allegations of the latter, whether upon knowledge or upon information and belief, are to be assumed as true. There is, however, this qualification of the rule, that where facts and circumstances disclosed by the answer are wholly inconsistent with a general affirmation or denial contained therein, the former shall prevail over the latter. An answer is regarded, not merely as a response to the charges and interrogatories of the complaint, but as a pleading of the defendant, in which he may set up any matter of defence, whether within his knowledge or not, and consequently if such matter of defence is not to be taken as true when the cause is heard on bill and answer, then it would be in the power of the complainant to preclude the defendant from any defense, not resting in his personal knowledge, by refusing to file a replication and setting the cause down for argument on bill and answer. But it is unnecessary to pursue the subject. The rule, as above stated, is founded in reason and is perfectly well settled.

With this view of the nature and effect of the answer, we are prepared to determine the question of forfeiture of the plaintiffs' shares of stock. The bill is filed by Peter Von Schmidt, Julius H. Von Schmidt, Thomas S. Holman, and Lewis F. Newman. On the argument, nothing was said of Julius H. Von Schmidt, but it was said that two persons by the name of Holman had been expelled from the company. On looking at the names of the subscribers to the articles of association, we find Julius H. Von Schmidt, and but one Holman. There seems to be, in this respect, a discrepancy between the papers and the argument of counsel, which we can account for only upon the supposition that Julius H. Von Schmidt and Julius H. Holman are one and the same person. We shall assume that they are, and if we are wrong, the error may be corrected on the application of counsel.

The case of Peter Von Schmidt differs from that of the other plaintiffs, and the latter all stand upon the same ground. We will first dispose of them. They were expelled from the company and their shares forfeited by virtue of the latter clause of article 22 of the articles of association, which declares that "any operative shareholder, who shall, within three months "after the arrival of the company in California, desert the "company without leave, shall, in addition to his labor stock, "forfeit his two shares of money stock." The only question under this is, whether these plaintiffs did desert the company without leave within three months after its arrival. The company arrived about the first day of September, from which date the three months would begin to run. Did, then, these plaintiffs thus desert within three months from the first day of September? They arrived here some three months previous to the rest of the company, and, after having proceeded to the mines, returned to San Francisco, where they engaged in business on their individual account, for the profits of which they refused to render any account to the company, notwithstanding one of the articles of association required every operative shareholder to devote his entire time and energies to promote the common interest. After the arrival of the company they exerted their efforts to break up and disorganize it, refused to labor for it when directed so to do, or to attend its meetings, refused to accompany a portion of the members who were ordered to proceed and did proceed to the mines, in pursuance of the objects of the association, and openly declared that they no longer considered themselves members of the association, for they could make more money by leaving it and forfeiting their stock than by remaining in it as operative shareholders, and in addition thereto, endeavored to persuade other members to desert the company and co-operate with them in their disorganizing proceedings. Neither of them has contributed his labor or services in any shape to the company, but all of them have, of their own choice, been engaged in pursuits for their private benefit. These are the facts disclosed by the answer and which we must assume to be true; and if they do

not constitute a desertion of the company without leave within three months after its arrival, we can conceive of no state of facts which would amount to such desertion. With this view the company, upon due notice, resolved that these plaintiffs had deserted the company and had thereby forfeited both their labor and money stock. From that forfeiture the court cannot relieve them. (2 *Story's Eq. Juris. sec.* 1324, 1325.)

How stands the case with Peter Von Schmidt? Contracts, like statutes, by reason of which a forfeiture is claimed to have accrued, should be construed strictly, and the facts urged in support of the forfeiture ought to be clear and explicit, and not be left to inference and argument. It appears that Von Schmidt was expelled from the company, and his stock forfeited before his arrival, for the answer states that notice could not be served upon him by reason of his continued absence; and absence without leave is made, by the articles of association, a different offense from desertion without leave, and is followed by different consequences. We do not see that the facts stated in the answer make out a case of desertion, without leave, on the part of Von Schmidt, within the exact period of three months after the arrival of the company in California. He is not, therefore, subject to the penalty imposed by the second clause of the 22d article, and consequently the forfeiture of his money stock is not warranted. The burden of the charge against him is of absence without leave. The first clause of the 22d article provides, " That any operative shareholder who shall absent himself during any portion of the time hereby limited, " without leave, or providing a proper substitute, unless relieved " by a vote of a majority of the operative shareholders for " good cause assigned, shall forfeit his interest in the labor " stock." It was the duty of Von Schmidt to have used due diligence in reaching California, and making proper allowance for his detention in New York to construct certain machines for the company, the facts warrant the conclusion that he did not use such diligence. His absence was, within the first clause of the 22d article, an absence without leave, which would warrant the resolution of the company forfeiting his labor stock. But

the view we take of the other points in the case, renders it a matter of no moment whether his labor stock has been forfeited or not. There is another subject connected with the case of Von Schmidt, which it becomes necessary to notice. He agreed to complete for the company three gold washing machines for the sum of three thousand dollars, which was paid to him. The company was afterwards obliged to pay two hundred dollars more, in order to get the machines finished. This latter sum must be deducted from the amount of Von Schmidt's portion on the final distribution of the effects of the company.

The next inquiry is as to the dissolution of the company. Was the company dissolved, as the bill alleges, before this suit was commenced? The answer positively denies that the company has declared a dissolution or intended to do so, or that a dissolution has been resolved upon or has in fact taken place. At the same time it admits that an " adjournment" has been made to the first day of September next; that all the property of the company has been sold, and that instructions have been given to the defendants to distribute the proceeds of the sale amongst the shareholders. It is evident that the members of the company have done all in their power to dissolve it, and yet they have been unable to accomplish their object. By the first article of association, the subscribers agree to associate themselves for the purpose of prosecuting the business of mining in California, from the first day of January, 1849, until the first day of October, 1853. By article 27, " All the shareholders " mutually agree, that the company shall not be dissolved before " the expiration of the term above limited, unless the enter- " prise be fairly tried and prove unprofitable : nor without the " unanimous consent of the operative shareholders ;" and further, that " In case the operative shareholders shall, at any time after " one year from their arrival in California, determine that said " enterprise cannot be successfully or profitably carried on, then, " but not otherwise, they may by an unanimous vote declare the " dissolution of the company." This company belongs to the class of joint stock associations rather than to that of ordinary partnerships, and it is therefore unnecessary to discuss the

Von Schmidt *v.* Huntington.

mooted point whether one partner, without the consent of the others, has the right to dissolve a partnership formed for a limited period, (*see Collyer on Part. Ed.* 1848, *p.* 103, *and note.—Story on Part. sec.* 275, 276,—*and* 3 *Kent's Comm.* 55,) for, conceding the affirmative of the question, it by no means follows that the same rule would be properly applied to companies like the one under consideration, although the principles which control the one class, are, as a general thing, applicable to the other. Under the articles of association, the company had no power to declare a dissolution at any time before the first day of October, 1853, except by the unanimous vote of the operative shareholders; and even an unanimous vote could not effect this object until after the expiration of one year from the time of the arrival in California. We say *under* the articles of association; but these, like any other contract, might be cancelled by the mutual agreement to that effect of all the parties. (*Story on Part. sec.* 266, *et seq.*) No such agreement appears to have been made by all the parties, and consequently no dissolution had taken place at the time the suit was brought.

The question then is, ought the court to decree a dissolution? The bill contains no distinct prayer for such relief; it, however, proceeds upon the hypothesis that the company had already been legally dissolved, and seeks to have the property sold, and the avails distributed. This amounts in substance to a prayer for a dissolution; and in disposing of cases belonging to the former order of things, we are directed to overlook informalities. The bill alleges that it had been found impracticable to keep the company together—the answer does not deny it—and we are convinced of its truth. The successful prosecution of gold mining at the present time, under such an organization as is prescribed by these articles of association, appears to us to be an impracticability and a delusion, and in such event it is proper for courts to interfere and decree a dissolution. (*Story on Part. sec.* 390.) Besides, the desire of the members is sufficiently indicated, and being in accordance with the interests of all concerned, ought not to be thwarted.

We come now to the last point of discussion. How shall the

effects of the company be divided? Amongst the money shares alone, or amongst the money and the labor shares equally? In order to determine this, we must endeavor to ascertain the intention of the parties at the time when they formed this association in the city of New York. The contingency of a dissolution before the expiration of one year not having been contemplated, the articles of association contain no provision as to distribution in case of the occurrence of such an event. It is true that article 19 directs the manner in which the division shall take place, in case the company shall determine to dissolve at the end of the period limited in the articles, "or at any other "time." But this last clause must be construed in connection with article 27, which expressly prohibits a dissolution until after the expiration of one year, and can be applied only to the period intervening between the expiration of the first year and the end of the entire term. It was the intention, therefore, that the operative shareholders should render their services to the company for at least one year, in compensation for which they are each allowed eight shares of stock—an allowance which it is impossible to conceive was intended to be made to the operative shareholders merely for superintending the transportation of the effects of the company to California, and immediately selling them. This would be an enormous per centage for factor's commissions. So far, then, as the intention can be gathered from the articles of association, the performance of at least one year's services seems to have been made a condition precedent to the right of the operative shareholders to claim, upon the distribution of the effects of the company consequent upon a dissolution, a dividend upon their labor shares. And this construction is in accordance with the equity of the case. The operative shareholders have consumed some sixteen thousand dollars of the cash capital paid in, in defraying their expenses hither, and we deem this an ample equivalent for all the labor they have performed. The distribution must, therefore, be made upon the money shares alone.

The sole remaining question is as to costs. These should be paid out of the fund. And as, according to the view above

taken, the company could not be legally dissolved, except by the decree of a competent court; and as the filing of the bill was, therefore, for the mutual benefit of all the members, the expense of the proceeding ought not to be sustained by a few of them alone. A counsel fee will be allowed, in the discretion of the district court, not exceeding three hundred dollars on each side.

A decree must be entered dissolving the company as of the date when the judgment appealed from was rendered, (Jan. 24, 1850.) The receiver appointed by the court below, will proceed under the direction of the district court, to sell at public auction all the effects of the company, if there be any remaining unsold, and out of the moneys now in his hands, and which may come into his hands, will pay the costs of the suit and the counsel fees as above directed, and will then make a *pro rata* distribution of the balance of the fund amongst all the money shareholders, with the exception of the two Holmans and Newman, and deducting two hundred dollars from the amount which would otherwise be payable to Peter Von Schmidt. Either party will apply to the district court for any order necessary to carry this decree into execution.

Ordered accordingly.