[S. F. No. 20720. In Bank. Jan. 9, 1962.]

ANTHONY DiGENOVA, Plaintiff and Respondent, v. THE STATE BOARD OF EDUCATION et al., Defendants and Appellants.

Stanley Mosk, Attorney General, Lee B. Stanton, Deputy Attorney General, Dion R. Holm, City Attorney, and Irving G. Breyer for Defendants and Appellants.

Leon E. Shiells for Plaintiff and Respondent.

Kenny, Morris & Ibanez, Robert W. Kenny, Stephen J. Zetterberg and Young, Zetterberg, Henrie & McCarthy as Amici Curiae on behalf of Plaintiff and Respondent.

GIBSON, C. J.—Defendants appeal from a judgment which granted a peremptory writ of mandate directing the State Board of Education to reinstate plaintiff's credentials as a teacher and requiring the Board of Education of the City and

County of San Francisco to reinstate plaintiff to his position in the public schools of San Francisco. His credentials were revoked and he was dismissed from his position on the theory that this action was required by sections added to the Education Code effective as of July 2, 1952, which in general prohibit the employment in public schools of persons convicted of certain sex offenses defined in specified sections of the Penal Code and the Welfare and Institutions Code.[1] (Stats. 1953, 1st Ex. Sess. 1952, ch. 25, p. 389.) The principal question presented on this appeal is whether the legislation is to be applied retrospectively to a person convicted prior to its enactment.

In December 1945, over six years before adoption of the legislation, plaintiff was charged in the Municipal Court of the Los Angeles Judicial District with ''a misdemeanor, to wit: vagrancy lewd,'' and, after pleading guilty, was sentenced and paid a fine of $50. Although the docket of the criminal trial does not disclose whether the conviction was for violation of a statute referred to in the 1952 legislation, we may assume, in view of the pleadings here, that it was for violation of one of those statutes, namely, subdivision 5 of section 647 of the Penal Code which, at that time, provided that every ''idle, or lewd, or dissolute person, or associate of known thieves'' was a vagrant and guilty of a misdemeanor.[2]

Prior to January 1949 plaintiff received a general elemen-

---

[1] The sections of the legislation in question were renumbered in 1959, and they will be referred to in this opinion by their new numbers.

Section 12912 of the Education Code provides: '' 'Sex offense' as used in Sections 13130, 13207, 13218, 13255, and 13586 of this code means any offense defined in Sections 266, 267, 285, 286, 288, 288a, 647a, subdivision 3 or 4 of Section 261, subdivision 5 of Section 647, or subdivision 2 of Section 311 of the Penal Code; or any offense defined in subdivision 1 of Section 311 of the Penal Code committed on or after the effective date of the amendment of this section made at the 1955 Regular Session by the Legislature; or any offense involving lewd and lascivious conduct under Section 702 of the Welfare and Institutions Code; or any attempt to commit any of the above-mentioned offenses; or any offense committed or attempted in any other state which, if committed or attempted in this State, would have been punishable as one or more of the above-mentioned offenses.' '

The other pertinent sections added in 1952 will be set forth later.

[2] In May 1947 plaintiff was convicted of violating section 41.10 of ordinance 77000 of the City of Los Angeles, which prohibited a person from renting a room with the understanding or belief that the room is to be used by the person to whom it is rented for certain purposes, including lewd conduct. This conviction, however, has no bearing upon the present case because the statutes involved here do not direct mandatory revocation of teaching credentials or dismissal from employment for violations of ordinances.

tary school credential, and in that month, more than three years before enactment of the legislation in question, he was employed as a teacher by the San Francisco Unified School District. He acquired tenure and remained a teacher in the district until the date of his dismissal. A special teaching credential issued to him by the state in 1951 was renewed on April 30, 1953.

The record does not show when the fact of plaintiff's conviction was discovered, but he was dismissed without notice or hearing on September 28, 1953, and his credentials were revoked on October 29. His petition for mandate, filed in December 1953, alleged in part that the action taken against him was invalid because it was without notice or hearing. Judgment was entered for plaintiff on this ground, and we reversed, holding that no notice or hearing was required. (*DiGenova* v. *State Board of Education* (1955) 45 Cal.2d 255 [288 P.2d 862].) Subsequently it was held in *Fountain* v. *State Board of Education* (1958) 157 Cal.App.2d 463 [320 P.2d 899] (hearing denied by this court) that the legislation involved here was not intended to apply retrospectively to persons convicted of a sex offense prior to the effective date of the statute. In rendering the judgment from which the present appeal was taken, the trial court followed the rule laid down in the *Fountain* case and held that defendants exceeded their jurisdiction in revoking plaintiff's credentials and terminating his employment.

It is specifically provided in three of our basic codes that no part thereof is retroactive "unless expressly so declared." (Civ. Code, § 3; Code Civ. Proc., § 3; Pen. Code, §3.) This is a rule of construction originally developed by the courts. In *People* v. *Harmon*, 54 Cal.2d 9, 25 [351 P.2d 329], it was said that section 3 of the Penal Code, *supra*, "is but a restatement of a 'general rule of statutory construction' (*Von Schmidt* v. *Huntington* (1850) 1 Cal. 55, 65) recognized by the Code Commissioners by their citation of that and kindred cases." Similar statements appear in *In re Cate*, 207 Cal. 443, 448-449 [279 P. 131], and in *Estate of Potter*, 188 Cal. 55, 65 [204 P. 826]. Accordingly, where language used by the Legislature has not clearly shown that retroactive application was intended, the rule against retroactive construction has uniformly been held applicable to codes or acts not containing the provision set forth in the Civil Code, the Code of Civil Procedure, and the Penal Code. (*State* v. *Industrial Acc. Com.*, 48 Cal.2d 355, 361-362 [310 P.2d 1] [Labor

Code]; *Aetna Cas. & Surety Co.* v. *Industrial Acc. Com.*, 30 Cal.2d 388, 393-395 [182 P.2d 159] [Labor Code]; *Krause* v. *Rarity*, 210 Cal. 644, 655-656 [293 P. 62, 77 A.L.R. 1327] [former California Vehicle Act]; *In re Cate*, 207 Cal. 443, 448-449 [279 P. 131] [State Bar Act]; *Estate of Potter*, 188 Cal. 55, 65, 68 [204 P. 826] [former Inheritance Tax Act]; *Chambers* v. *Gibb*, 186 Cal. 196, 199 [198 P. 1032] [former Inheritance Tax Act]; *Willcox* v. *Edwards*, 162 Cal. 455, 460-461 [123 P. 276, Ann.Cas. 1913C 1392] [amendment to the Constitution]; *Bascomb* v. *Davis*, 56 Cal. 152, 156 [federal act]; *Gates* v. *Salmon* (1865) 28 Cal. 320, 321-323 [former Practice Act].)

It is thus clear that the absence of the statutory provision from other codes and statutes, including the Education Code, does not indicate that with respect to those enactments the Legislature has rejected the rule against a retroactive construction or that some different rule is applicable. The rule to be applied is the same with respect to all statutes, and none of them is retroactive unless the Legislature has expressly so declared.

The statement in the Education Code that its provisions are to be liberally construed with the view to effect its objects and promote justice (§ 2) cannot be interpreted as a declaration that any of its sections is to be given retroactive effect. *Aetna Cas. & Surety Co.* v. *Industrial Acc. Com.*, 30 Cal.2d 388 [182 P.2d 159], involved the question whether an amendment to the Workmen's Compensation Act increasing benefits to injured employees could be construed as retroactive in the absence of an express declaration. The Labor Code directs (§ 3202) that its provisions governing workmen's compensation are to be "liberally construed by the courts with the purpose of extending their benefits for the protection of persons injured in the course of their employment." It was argued that in view of this declaration and decisions holding that all reasonable doubt must be resolved in favor of the employees, the amendment should be given retroactive application. In rejecting this argument, the *Aetna* opinion stated (30 Cal.2d at p. 395): "No authority is cited for this novel doctrine which would require the court to ignore the rule against retroactive operation with respect to statutes increasing benefits to persons favored by remedial legislation. The rule of liberal construction and the rule that statutes should ordinarily be construed to operate prospectively are neither inconsistent nor mutually exclusive. They

174

relate to different aspects of the interpretation of statutes, and are found in most of the codes, including the Labor Code. (Civ. Code, §§ 3, 4; Code Civ. Proc., §§ 3, 4; Pen. Code, §§ 3, 4; Lab. Code, §§ 4, 3202.) It would be a most peculiar judicial reasoning which would allow one such doctrine to be invoked for the purpose of destroying the other. It seems clear, therefore, that the legislative intent in favor of the retrospective operation of a statute cannot be implied from the mere fact that the statute is remedial and subject to the rule of liberal construction."[3]

*State* v. *Industrial Acc. Com.*, 48 Cal.2d 355, 361-362 [310 P.2d 1], also involved the question of whether an amendment to the workmen's compensation provisions of the Labor Code was retroactive. It was there pointed out that nowhere in the amendment had the Legislature declared that it should be given retroactive operation, and the court concluded that the claim of retroactivity was unsound notwithstanding the fact that the legislation was remedial and curative in character and was based on legislative declarations and findings concerning public policy and public welfare and the inequity existing under the law prior to the amendment.

 It is settled therefore that no statute is to be given retroactive effect unless the Legislature has expressly so declared and that this rule is not limited by a requirement that a statute be liberally construed to effect its objects and promote justice.

We come now to a consideration of the provisions of the 1952 legislation which were applied retroactively by defendants in revoking plaintiff's credentials.

Section 13207 of the Education Code provides: "Whenever the holder of any credential, life diploma, or document issued by the State Board of Education has been convicted of any sex offense as defined in Section 12912, the State Board of Education shall forthwith suspend the credential, life diploma, or document. If the conviction is reversed and the holder is acquitted of the offense in a new trial or the charges against him are dismissed, the board shall forthwith terminate the suspension of the credential, life diploma, or document. When

---

[3]Section 4 of the Labor Code, cited in the *Aetna* case to show that the rule against retroactive construction was operative notwithstanding the rule of liberal construction, is identical to section 22 of the Education Code. These sections provide: "No action or proceeding commenced before this code takes effect, and no right accrued, is affected by the provisions of this code, but all procedure thereafter taken therein shall conform to the provisions of this code so far as possible."

the conviction becomes final or when imposition of sentence is suspended the board shall forthwith revoke the credential, life diploma, or document."[4]

The quoted section, considered as a whole, shows a plan of first suspending credentials immediately upon conviction and then, subsequent to events occurring after the effective date of the enactment, revoking them, and this plan would not be applicable to convictions which became final prior to 1952. As appears from the first sentence the preliminary step of suspension, which, of course, could occur only after the effective date of the enactment, must be taken "forthwith" after conviction. The second sentence shows that the convictions referred to are subject to reversal after the effective date of the enactment, followed by acquittal or dismissal of charges. The last sentence contemplates that revocation of credentials shall take place only with respect to cases in which a conviction "becomes" final or in which imposition of sentence "is suspended," i.e., events occurring after enactment of the section. The language "has been convicted" (in the present perfect tense), which appears in the first sentence of the section, is not helpful in determining the question of retroactivity. The act is a direction to the persons charged with administering it, and when viewed as of the time the act is being applied the quoted words can as readily be understood either as "has been convicted after the effective date of the act" or as "has been convicted before or after the effective date of the act." Nothing in the section points in the direction of retroactive application, and certainly none of its language constitutes an express declaration that the statute should operate retroactively.

Section 13255, relating to certified employees, provides: "Governing boards of school districts shall not employ or retain in employment persons in public school service who have been convicted of any sex offense as defined in Section 12912. If, however, any such conviction is reversed and the person is acquitted of the offense in a new trial or the charges against him are dismissed, this section does not prohibit his employment thereafter."[5]

---

[4] Section 13218, which is not applicable to plaintiff because it deals with suspension and revocation by county boards of county-issued certificates, contains language similar to that found in section 13207.

[5] Similar language is contained in section 13586, which is inapplicable to plaintiff because it relates to "classified" employees, i.e., those in positions not requiring certification qualifications.

■ Section 13255 shows a pattern or approach somewhat like the one taken in section 13207 in that the operation of this section is affected by events occurring after the effective date of the act, such as reversal followed by acquittal. As in the case of the words "has been convicted" in section 13207, the words "have been convicted" in section 13255 in no way indicate an intent that the provisions apply retroactively.

Such an intent is not suggested by the phrase "retain in employment"; it shows only that the act applies to those employed in the public schools when convicted as well as to those seeking employment after conviction. Again nothing in the section points in the direction of retroactive application, nor does it contain an express declaration of retroactivity as required by the settled law of this state.

■ The Legislature, of course, is well acquainted with this fundamental rule, and when it intends a statute to operate retroactively it uses clear language to accomplish that purpose. For example, section 290 of the Penal Code, which, like the legislation before us, relates to collateral consequences of convictions of certain sex offenses, has provided from the time of its enactment in 1947 that any person who, "since the first day of July, 1944, has been or is hereafter convicted" of the enumerated offenses shall register with the chief of police or sheriff where he resides. Similarly, in 1955 subdivision (i) was added to section 13129 of the Education Code to provide for permissive rather than mandatory denial of credentials for convictions of violating subdivision 1 of section 311 of the Penal Code (indecent exposure) occurring "prior to the effective date" of the provision.[6]

■ Defendants invoke reports of the Assembly Subcommittee on Sex Crimes (one made before and the other after the legislative session at which the statute in question was enacted) to show the Legislature intended that the 1952 provisions should have a retroactive effect. Such reports, however, cannot supplant the established statutory and common-law requirement that no provision of a statute is retroactive

---

[6]In view of this change it was necessary to amend section 12912, which, as enacted in 1952, included convictions of indecent exposure for purposes of the mandatory legislation before us. Accordingly, by a companion measure section 12912 was amended, insofar as concerns violations of subdivision 1 of section 311 of the Penal Code, to refer only to offenses committed "on or after the effective date of the amendment of this section made at the 1955 Regular Session by the Legislature. . . ." The quoted language was added to section 12912 for the special purpose of making a clear contrast with the new provision for permissive action and avoiding conflict between that provision and the 1952 legislation.

unless expressly so declared. Even if the reports could be so invoked, they do not discuss the question of retroactive application or contain anything showing that such an application was intended. The Preliminary Report submitted on March 8, 1950, states (at p. 9) that the problem of sex crimes has two major aspects, the protection of the community and the control, correction, or treatment of the individual offender. Although the term "sex offender" was described as meaning "past" offender (Prelim. Rep., p. 30), this was done to differentiate such an offender from the "future sex offender," described as a person who probably will commit a sex crime (Prelim. Rep., pp. 32-33), and not to indicate the desirability of retroactive measures. The report submitted in August 1952 after the effective date of the legislation stated at page 42 that "a person convicted of a sex offense should not continue to be employed in the Public School System." As we have seen, words such as "retain in employment" do not indicate retroactivity, and the same is true of the comparable words in the report, "continue to be employed." Moreover, in making this statement subsequent to the enactment of the legislation the subcommittee was considering, not the question of retroactivity, but rather, as shown by the next sentence in the report, the question whether a convicted employee should be allowed "to terminate from one school district and to then obtain employment at another school."

It is also urged by defendants that retroactive application of the legislation before us is essential for the adequate protection of school children. This was a policy matter for the Legislature to consider. When the statutes in question were enacted in 1952 there were already provisions in existence, which are still operative, for excluding from the school system persons dangerous to children by reason of sexual misconduct. Under these provisions any dangerous person can be excluded from teaching on grounds such as "evident unfitness" (e.g., Ed. Code, §§ 13202, 13209), and, of course, it would be appropriate under them to consider a conviction of a sex offense regardless of when it occurred. It is true that the 1952 legislation is more sweeping than these provisions in that it imposes a mandatory duty to take action, without notice or hearing, against a person coming within its terms even though he may have evidence that he has been rehabilitated and is presently fit to be a teacher. However, it is fallacious to suggest that, unless the 1952

legislation is held to operate retroactively, school children will be left without protection. In view of the protection afforded by the other provisions the Legislature may have concluded that retroactive application of the 1952 legislation was undesirable because it would automatically, irrespective of what showing could be made of rehabilitation and present fitness, result in destroying the means of livelihood of persons having no warning of this consequence until after their conviction. Whether the Legislature was influenced by these considerations or by others, the fact remains that it used no language expressing an intent to make the legislation apply retroactively.

The question whether the 1952 legislation was retroactive was squarely presented in *Fountain* v. *State Board of Education, supra,* 157 Cal.App.2d 463, which held that it does not apply to persons convicted of sex offenses before its effective date. The decision that the teacher was entitled to reinstatement rested solely on the determination with respect to retroactivity, since the only other question involved in the case was resolved against him. We unanimously denied a petition for hearing in that case. Although this court's denial of a hearing is not to be regarded as expressing approval of the propositions of law set forth in an opinion of the District Court of Appeal or as having the same authoritative effect as an earlier decision of this court (*Western Lithograph Co.* v. *State Board of Equalization,* 11 Cal.2d 156, 167-168 [78 P.2d 731, 117 A.L.R. 838]; *Bohn* v. *Bohn,* 164 Cal. 532, 537-538 [129 P. 981]; *People* v. *Davis,* 147 Cal. 346, 350 [81 P. 718]), it does not follow that such a denial is without significance as to our views (see *Cole* v. *Rush,* 45 Cal.2d 345, 351, fn. 3 [289 P.2d 450, 54 A.L.R.2d 1137]; *Eisenberg* v. *Superior Court,* 193 Cal. 575, 578 [226 P. 617]). *Cole* v. *Rush* quoted with approval the following statement from the *Eisenberg* case (at p. 578): "The order of this court denying a petition for a transfer . . . after . . . decision of the district court of appeal may be taken as an approval of the conclusion there reached, but not necessarily of all of the reasoning contained in that opinion." It should be noted that the Department of Education, acting on the basis of the *Fountain* decision, reinstated several persons whose credentials had been revoked for pre-1952 convictions and that, although the case was decided in February 1958, the Legislature has not seen fit to make any amendment to overcome its effect.

 There is no merit to the contention that the decision

of this court upon the prior appeal (*DiGenova* v. *State Board of Education*, 45 Cal.2d 255 [288 P.2d 862]) constitutes the law of the case so as to preclude us from holding as to plaintiff that the 1952 legislation is not retroactive. The doctrine of the law of the case does not extend to points of law which might have been but were not presented *and determined* on a prior appeal. (*Steelduct Co.* v. *Henger-Seltzer Co.*, 26 Cal.2d 634, 644 [160 P.2d 804]; *Moore* v. *Trott*, 162 Cal. 268, 273 [122 P. 462]; *Trower* v. *City & County of San Francisco*, 157 Cal. 762, 765 [109 P. 617]; *Skaggs* v. *City of Los Angeles*, 138 Cal.App.2d 269, 273 [291 P.2d 572, 292 P.2d 572]; *Webb* v. *Saunders*, 89 Cal.App.2d 732, 736 [201 P.2d 816].) ▮ The opinion of this court in 45 Cal.2d was limited to the question whether plaintiff could properly be dismissed without notice or hearing. It contained nothing upon the question of retroactive construction but, to the contrary, stated that "on retrial plaintiff may show that the boards exceeded their authority in that the convictions were not those contemplated by section 12756 [now § 13207] or that he was not the person convicted." This language is clearly broad enough to permit consideration, upon retrial, of the question presented here, because the offense of which plaintiff was convicted would be among "those contemplated by" the legislation only if the legislation is construed as retrospective.

▮ Moreover, the doctrine of the law of the case, which is merely a rule of procedure and does not go to the power of the court, has been recognized as being harsh, and it will not be adhered to where its application will result in an unjust decision. (*Vangel* v. *Vangel*, 45 Cal.2d 804, 809-810 [291 P.2d 25, 55 A.L.R.2d 1385]; *England* v. *Hospital of Good Samaritan*, 14 Cal.2d 791, 795-796 [97 P.2d 813]; see *Gore* v. *Bingaman*, 20 Cal.2d 118, 122-123 [124 P.2d 17].) In the *England* case this court held that it would be unjust to apply the doctrine against a plaintiff where the law (relating to liability of charitable hospitals) had been "unsatisfactory in its statement" at the time of several prior appeals but was clarified, so as to permit recovery, in another case filed on the same day the England case was decided. The court declared that to refuse to apply the newly adopted rule to the plaintiff would "exalt form far above substance" and would result in a "most unjust decision." (14 Cal.2d at pp. 795-796.)

▮ The exception made in the *England* case has also been applied to cases where the controlling rules of law have been altered or clarified by a decision intervening between the first

and second determinations of the appellate courts. (*Subsequent Injuries Fund* v. *Industrial Acc. Com.*, 53 Cal.2d 392, 394-395 [348 P.2d 193]; see *Gore* v. *Bingaman*, 20 Cal.2d 118, 122-123 [124 P.2d 17]; *Standard Oil Co.* v. *Johnson*, 56 Cal. App.2d 411, 416 [132 P.2d 910].) The decision in *Fountain* v. *State Board of Education, supra,* 157 Cal.App.2d 463, was made between the prior appeal and the second trial in the present case, and, as noted above, the state board, acting on the basis of *Fountain,* restored credentials to several persons who had lost them as a result of the 1952 legislation. It is obvious that application of the doctrine here would result in a manifest injustice.

The local board asserts that at the second trial the court erred in denying its motion to dismiss for lack of jurisdiction. Section 583 of the Code of Civil Procedure requires that a case must be brought to trial within three years after the remittitur issued on appeal is filed in the trial court, and the position of the local board is that this requirement was not met because the proceedings instituted by plaintiff within the three-year period did not comply with the provisions of section 594 of the Code of Civil Procedure for a five-day notice of trial on an "issue of fact."[7] However, the answer of defendants admitted that the conviction occurred prior to 1952, and the issue of retroactivity presented only a question of law. No factual determinations were necessary to establish plaintiff's right to *reinstatement,* and the five-day notice requirement was inapplicable.[8] The trial court thus correctly denied the local board's motion to dismiss. A different situation was presented by plaintiff's request for *damages,* which involved questions of fact. Although the city was entitled to the five-day notice insofar as concerns trial of this issue, plaintiff submitted the case to the trial court for decision upon the sole issue of reinstatement, announcing that he was not then prepared to offer proof of damages, and the judgment does

[7]Section 594 of the Code of Civil Procedure provides in part: "1. In superior courts and municipal courts either party may bring an issue to trial or to a hearing, and, in the absence of the adverse party, unless the court, for good cause, otherwise direct, may proceed with his case, and take a dismissal of the action, or a verdict, or judgment, as the case may require; provided, however, if the issue to be tried is an issue of fact, proof must first be made to the satisfaction of the court that the adverse party has had five days notice of such trial."

[8]There may, of course, be a "trial" where only issues of law are determined. (*Cf. Carney* v. *Simmonds,* 49 Cal.2d 84, 90 [315 P.2d 305]; *O'Day* v. *Superior Court,* 18 Cal.2d 540, 544-545 [116 P.2d 621]; *City of Pasadena* v. *Superior Court,* 212 Cal. 309, 313-314 [298 P. 968].)

not award damages. Plaintiff, who argues that the case should be remanded in order to try the issue of damages, is in no position to raise this point since he has not appealed.

The judgment is affirmed.

Traynor, J., Peters, J., White, J., and Dooling, J., concurred.

SCHAUER, J., Dissenting.—After detailed study of the record and the pertinent law in this case I am in accord with the scholarly and forthright opinion authored for the District Court of Appeal by Justice pro tempore Coakley, and concurred in by Presiding Justice Bray (Cal.App., 1961), 11 Cal.Rptr. 620, and by reference adopt it as explanatory of the reasons why I cannot join my associates in affirming the judgment of the superior court.

Although Justice Coakley's opinion is fully adequate and impelling to the conclusions reached, it, of course, was written before the opinion of my associates. In view of the importance of their ruling to the school children of California, to the parents of those children, to the members of the Legislature and to the great body of law abiding dedicated teachers who have *not* been convicted of sex crimes, it appears proper to add emphasis to those facts and those aspects of the law which in my view convincingly refute the position of the majority.

At the outset I emphasize that majority and minority justices alike are in accord as to all principles of law relevant to this case and that there is no dispute as to the basic facts. The disagreement between us is as to which principles of law *in the circumstances* should be given controlling effect. Furthermore, the decision (whichever way it goes) will not change any rule of law. Its only real significance lies in its contrasting effects on the two groups of persons immediately concerned; a decision favorable to one group is necessarily adverse to the other.

The majority hold that the subject legislation was intended by the Legislature to have only *prospective* application to a future group, not *immediate* application to an existing group. This ruling protects in employment that relatively small group of public school employes who on the effective date of the subject act had already been convicted of one or more of the sex crimes designated therein. By that holding the school children (and the teachers who have not suffered such con-

victions) are continued in whatever hazards, if any, may follow from retention in school employment of sex-crime convicts. The Legislature, it will appear, found such hazards to be so grave as to require immediate removal of such persons. As this court said in its earlier opinion (*DiGenova* v. *State Board of Education* (1955) 45 Cal.2d 255, 259 [2] [288 P.2d 862], the language used by the Legislature "implies that the [teaching] credential should be revoked without the delay which would be incident to a hearing" in order that such persons "should be promptly removed from the classroom and contact with students." The plaintiff here, on advice of the Attorney General, was so removed. I would sustain the removal.

As I read the subject Education Code sections and their legislative history I am impressed with the conclusion that the Legislature had well in mind the relative values of retrospective (i.e., immediate) and prospective applications of statutes—and the like relative values of forthwith eliminating from public school teachers' positions all convicted sex criminals as opposed to making the statute operative *only as against those persons who might in the future* be convicted of sex crimes.

This latter alternative seems to me to be pathetically reminiscent of locking the barn door after the horse is stolen; the first conviction for which a second offender could be removed under this legislation as the majority construe it could well be for an offense against one of the children.

In resolving the ultimate issue I think we must necessarily consider and at least impliedly answer the following questions: Did the Legislature designate as of the date of its action a class of persons (convicted sex criminals) ineligible to hold teachers' positions and prescribe a procedure for their immediate removal? Or did it merely prospectively provide for a future class who upon conviction would then become ineligible? For example, did the Legislature find that a school teacher convicted one day *before* the effective date of the 1952 enactments of enticing an "unmarried [chaste] female . . . under the age of eighteen years, into any house of ill-fame, . . . for the purpose of prostitution" was *not* a hazard to school children and therefore not properly subject to forthwith removal but that a person convicted of the same offense (violation of Pen. Code, § 266) one day later was such a hazard and subject to such removal? For whose benefit was and is this legislation intended: The school children unquali-

fiedly? Or the school children subject first to maintaining in the schools that group of teachers who had been convicted of sex crimes? Against what dangers is the legislation intended to protect the children: Only against a prospective danger from prospective teachers who may one by one, in the future become convicted sex criminals? Or, as well, against a present and existing danger from all who had in the past been discovered and convicted and who were then employed in the schools?

By the obviously implied answers of the majority to the foregoing questions it appears to me that their allocation of relative values differs sharply from that manifested by the Legislature and which is also developed and expressed in Justice Coakley's opinion and in my own views.

The writ of mandate issued by the court below directs the State Board of Education to reinstate the teaching credentials of plaintiff DiGenova, and orders the Board of Education of the City and County of San Francisco to reinstate him to his position as teacher in the public schools. His credentials had been revoked and he had been discharged when it was discovered from court records that *before* his certification and employment he had twice been convicted of sex crimes. The issue as indicated by the above stated questions, is whether the Education Code of California as amended in 1952, regardless of the type of teaching certificates previously issued, requires forthwith revocation of credentials and dismissal from employment, of teachers currently employed who had been convicted of sex crimes before the date of enactment of the pertinent code sections as well as those thereafter so convicted. Both for the reasons presented by Justice Coakley and for those hereinafter stated I am convinced that the trial court erred in ordering defendants to reinstate plaintiff, and that the judgment should be reversed.

As recognized in the majority opinion this case has heretofore been before us. (*DiGenova* v. *State Board of Education* (1955), *supra*, 45 Cal.2d 255, 257-260 [1-6].) Because, however, of the importance of showing the intention of the Legislature in enacting the subject legislation a further factual statement is appropriate. As appears from our opinion on the first appeal DiGenova, before receiving his teaching credentials, had been convicted in the municipal court of Los Angeles, once of "vagrancy lewd" and once of a violation of section 41.10 of ordinance 77000 of that city (see fn. 3, p. 258, of the first *DiGenova* case, *supra*) for an offense termed

''consorting.'' These convictions, as shown by certified copies of the court records which are attached to defendants' return and which constitute the sole factual basis for defendants' actions, occurred, respectively, in 1945 (December 28) and 1947 (May 15). About 20 months after the second conviction, he received his first credentials to teach and became a teacher in the San Francisco public school system. In January 1952 he acquired permanent tenure in that system. In July 1952 following a series of sex crimes against children and an extended study of the possible or probable proclivities of sex crime offenders as employes in the public schools, the Legislature added several sections to the Education Code ''relating to persons convicted of sex offenses in respect to employment in the Public School System. . . .'' (Stats. 1953, 1st Ex. Sess. 1952, ch. 25, p. 389.) The added sections, construed in the circumstances of their enactment, were intended to and do provide for a mandatory and immediate purging of convicted sex criminals from employment in public schools. The character of such legislation is not penal. Rather, it is remedial and procedural; it recognizes an existing source of danger in the schools and provides a remedy.

In April 1953 the State Board of Education renewed DiGenova's credentials, for a period expiring in November 1956. Shortly after this last mentioned renewal the state and local boards discovered the public record facts of DiGenova's sex crime convictions and without notice or hearing the San Francisco board dismissed him and the state board revoked his credentials the following month. DiGenova does not now deny—rather, he *asserts*—the fact of his convictions, as hereinafter related. He does not suggest that he had disclosed in his employment application, or that either board was aware of, his criminal record prior to the latest renewal of his official papers. In December 1953 he instituted this mandamus proceeding, and procured a judgment in his favor on the ground that he could not lawfully be deprived of his credentials and his position ''without charges, notice or hearing.''[1] This court reversed and remanded, with the statement that ''on retrial plaintiff may show that the boards exceeded their authority in that the convictions were not those con-

---

[1]At the hearing in the trial court on that occasion plaintiff's counsel stated ''that the only question involved was that the revocation of plaintiff's credentials by the state board and his dismissal by the San Francisco board were had without charges, notice or hearing.'' (*DiGenova* v. *State Board of Education* (1955), *supra*, 45 Cal.2d 255, 258.)

templated by section 12756 [the pertinent 1952 statute, now numbered § 13207] or that he was not the person convicted and thus obtain appropriate relief. Plaintiff argues those questions here but in the trial court he relied solely on the lack of notice and hearing which was the basis of that court's decision.'' (*DiGenova* v. *State Board of Education* (1955), *supra*, 45 Cal.2d 255, 263.)

Remittitur was filed with the clerk of the superior court on November 15, 1955. DiGenova took no steps to set the case for retrial until September 26, 1958, when he filed a motion to advance retrial date, on the ground that unless brought to trial prior to November 15, 1958 (within three years from date remittitur filed), section 583 of the Code of Civil Procedure required dismissal of the case. At this time he further declared to the court that he wished to rely upon *Fountain* v. *State Board of Education* (1958) 157 Cal.App.2d 463 [320 P.2d 899], decided in February 1958. The court below advanced the trial date as requested and, in express and sole reliance upon the *Fountain* case, ordered appellants to restore DiGenova's credentials and to reinstate him as a teacher. This appeal followed.

It is the position of the majority that (1) enforcement of the 1952 additions to the Education Code as against theretofore accredited teachers, because of their likewise theretofore accredited status as persons convicted of sex crimes, would constitute *retrospective* application of the law; (2) that no legislation should be given retrospective effect unless the Legislature has clearly expressed an intention to that end; and (3) that the language used in the circumstances of the subject legislation does not manifest such a purpose.

I do not concede that the application of the remedial statute to DiGenova in the circumstances of this case is a true retrospective application but even assuming that it would be[2] I think that the language used by the Legislature, in the circumstances of the facts it found, clearly establishes an intention to make the remedy immediately available to the end of removing as far as possible the existing hazards to children. No contention is made that it was not within the power of the Legislature to provide for retrospective application, or that such application would be unconstitutional.

The general and established rule, upon which the majority

---

[2]This assumption as to retrospective application is carried forward in the discussion which follows, except where otherwise indicated.

rely and to which I subscribe, is not an absolute rule and does not preclude—indeed its specifically stated limitation supports—the view that I take. It is that "statutes are not to be given a retrospective operation unless it is clearly made to appear that such was the legislative intent." (*Aetna Cas. & Surety Co.* v. *Industrial Acc. Com.* (1947) 30 Cal.2d 388, 393 [5] [182 P.2d 159]; *State* v. *Industrial Acc. Com.* (1957) 48 Cal.2d 355, 361 [2] [310 P.2d 1].) Another statement of the rule is found in *Krause* v. *Rarity* (1930) 210 Cal. 644, 655 [11] [293 P. 62, 77 A.L.R. 1327] where the court, in considering the then recently enacted motor vehicle "guest law," stated that "although the legislature has the power to give a statute retrospective operation, if it does not impair the obligation of contracts or disturb vested rights, yet it is to be presumed that no statute is intended to have that effect, and it will not be given that effect, unless such intention clearly appear from the language of the statute. [Citation.]" In *East Bay Municipal U. Dist.* v. *Garrison* (1923) 191 Cal. 680, 692 [218 P. 43], which dealt with a "Municipal Utility District Act," it is observed that "it is a well-settled principle of statutory construction that an act will not be construed to be retroacive in the absence of *either* an express declaration to that effect *or* a very clear implication that such was the intent of the legislature." (Italics added.)

A narrower and more limited statement of the rule is found in the Civil Code, the Code of Civil Procedure, and the Penal Code, with respect to the provisions of such codes. Section 3 of each of those codes provides that "No part of it [the respective code] is retroactive, unless expressly so declared." (See *People* v. *Harmon* (1960) 54 Cal.2d 9, 25 [20, 21] [351 P.2d 329].) But no similar specification appears in the Education Code, wherein are the provisions now before us. On the contrary, section 10 of that code declares that "Unless the provisions or the context otherwise requires *these* [§§ 1 through 10] general provisions, *rules of construction*, and definitions *shall govern the construction of this code.*" (Italics added.) The general rule of construction thus referred to is found in section 2 of the Education Code, as follows: "The code establishes the law of this state respecting the subjects to which it relates, and its provisions and all proceedings under it are to be *liberally construed, with a view to effect its objects* and to promote justice." (Italics added.)

It thus appears plain that the general rule of clear intent (with liberal construction to effect its objects), rather than

the narrower "express" declaration, governs with respect to whether the statutes here involved are to be given retrospective application. If the Legislature had intended the narrower rule to apply when considering provisions of the Education Code, it is reasonable to believe it would have expressly so declared, as was done with respect to the other three codes mentioned. "The fundamental rule of statutory construction is that the court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. [Citations.] Moreover, 'every statute should be construed with reference to the whole system of law of which it is a part so that all may be harmonized and have effect.' . . . [P. 647.] It is not to be presumed that the Legislature used language in a sense which would render nugatory important provisions of the statute." (*Select Base Materials, Inc.* v. *Board of Equalization* (1959) 51 Cal.2d 640, 645 [1, 2] 647 [11] [335 P.2d 672]) ; also *Augustus* v. *Bean* (1961) 56 Cal. 2d 270, 272-273 [4] [14 Cal.Rptr. 641, 363 P.2d 873].)

" [I]t is a cardinal rule of construction that words must be given such interpretation as will promote rather than defeat the general purpose and policy of the law . . ." and that if possible statutes will be so construed as to avoid absurd applications and consequences. (*Department of Motor Vehicles* v. *Industrial Acc. Com.* (1939) 14 Cal.2d 189, 195 [4] [93 P.2d 131] ; see also *In re Cregler* (1961) 56 Cal.2d 308, 312 [4] [14 Cal.Rptr. 289, 363 P.2d 305] ; *Warner* v. *Kenny* (1946) 27 Cal.2d 627, 629 [3] [165 P.2d 889].)

As already stated herein, by the enactment of chapter 25, Statutes of 1953, First Extraordinary Session 1952, the Legislature added several new sections to the Education Code "relating to persons convicted of sex offenses in respect to employment in the Public School System. . . ." Such new sections, as hereinafter more specifically shown, appear to contemplate not merely the prevention of adding more convicted sex offenders as teachers in the future, or the discharge of those subsequently convicted of such offenses, but rather, the total elimination of convicted sex offenders from the public schools.

For clarity of reference to arguments in the former appeal, and to cited earlier decisions, it is noted that in 1959 the Education Code sections were renumbered. (Stats. 1959, ch. 2.) However, with the exception of section 12912, there has been no change of substance with respect to any of the code sections added in 1952 which are involved in this case.

Therefore, for convenience the current (1959) section numbers will be used herein although such sections when added in 1952 were numbered under the 1943 numbering system. (For identification of the former (1943) Education Code numbers see Tables, pp. cxciii et seq., Deering's Code, 1960.) Unless otherwise stated, all section numbers in this opinion refer to the Education Code. The pertinent sections (with italics added) are:

Section 13207: "Whenever the holder of any credential, life diploma, or document issued by the *State* Board of Education has been convicted of any sex offense as defined in Section 12912, the State Board . . . shall forthwith suspend the credential, life diploma, or document. . . . When the conviction becomes final or when imposition of sentence is suspended the board shall forthwith revoke the credential, life diploma, or document."

Section 13218 imposed the same duty upon *county* boards of education, with respect to holders of certificates issued by such boards.

Section 13255: "Governing boards of school districts shall not employ or *retain in employment* persons in public school service who have been convicted of any sex offense as defined in Section 12912. . . ."

Section 13586: "No person shall be employed or *retained in employment* by a school district who has been convicted of any sex offense as defined in Section 12912. . . ."

Section 12912 (as amended in 1955; Stats. 1955, ch. 874, § 1, p. 1489, at that time numbered 12011.7),: " 'Sex offense' as used in Sections 13130, 13207, 13218, 13255, and 13586 of this code means any offense defined in Sections 266, 267, 285, 286, 288, 288a, 647a, subdivision 3 or 4 of Section 261, subdivision *5* of *Section 647*, or subdivision 2 of Section 311 of the Penal Code; *or any offense defined in subdivision 1* of Section 311 of the Penal Code *committed on or after the effective date of the amendment of this section made at the 1955 Regular Session* by the Legislature. . . ."

Section 13130 as it read when originally enacted in 1952 (and then numbered § 12107) provided that the "State Board of Education shall deny any application for the issuance of a credential or a life diploma or for the renewal of a credential made by any applicant who has been convicted of any sex offense as defined in" section 12912. By the 1955 amendment of section 13130 and *addition* in the same year of sections 13208, 13219, 13256, and 13587 (Stats. 1955, ch. 874), the

Legislature extended to sexual psychopaths the proscriptions enacted in 1952 against those convicted of sex offenses as set forth in the various above-quoted sections. Of this more will be said hereinafter.

At all times here involved, subdivision 5 of section 647 of the Penal Code provided that, "5. Every lewd or dissolute person . . . Is a vagrant, and is punishable by a fine . . . or by imprisonment. . . ." In the court below (at the second trial) counsel for DiGenova declared his client was seeking "to retry the . . . case on the question of the retroactivity of this statute"; that "I want primarily to establish that he was the person [convicted] and the statutes under which he was dismissed were applied retroactively"; that the "one legal issue which remains to be resolved" is that of retrospective application of the statute; and that in 1945 DiGenova was found guilty of "Vagrancy, lewd," and in 1947 he was "found guilty and sentenced to jail *again* for a sex offense." (Italics added.) Thus DiGenova cannot now be heard to assert that he was not convicted of a sex offense within the provisions of the applicable sections of the Education Code.

All of the Education Code sections quoted hereinabove are found in division 10 of part 2 of that code. That division is entitled simply "Employees." Section 12912, which defines "sex offense," is found in chapter 1 of division 10, which chapter is entitled "Provisions Applying to All Employees." Sections 13207, 13218 and 13255 are found in chapter 2 of division 10, which chapter deals with "Certified Employees," i.e., teaching personnel. Section 13586 is found in chapter 3 of division 10, which chapter deals with "Classified Employees," i.e., nonteaching personnel.

It is my view that the clear and necessary implication from the particularized specifications of the 1952 statute is that the Legislature intended thereby to rid the public school system of *all* persons convicted of sex offenses regardless of whether the conviction was before or after enactment of the new legislation.

In the first place, the 1952 act directed state school boards (§ 13207) to revoke the credential and local boards (§ 13218) to revoke the certificate of teaching personnel "Whenever the holder . . . has been [finally] convicted of any sex offense. . . ." The language "Whenever . . . *has been*" (italics added) as used in sections 13207 and 13218 in my view shows in context a plain intent that the sections apply to past convictions. If the Legislature had intended otherwise, it could easily, and

to be consistent should, have used language so indicating, such for example, as appears in section 13204, which provides that "Whenever the holder . . . *is* charged with immoral or unprofessional conduct or evident unfitness for service or persistent defiance . . . the State Board . . . may require . . . a hearing. . . ." (Italics added.) Moreover, sections 13255 and 13586 speak in clear and positive terms in declaring that local boards shall not "employ or *retain*" teachers (§ 13255) or nonteaching personnel (§ 13586) "who *have been* [the majority read this as to "who shall hereafter be"] convicted of any sex offense as defined in Section 12912." (Italics added.) Thus sections 13255 and 13586 appear by clear language to *forbid* the *retention in employment* of persons, whether teachers or nonteaching personnel, who have been convicted of sex offenses. When thus read together the various sections of the 1952 act show a manifest legislative purpose to rid the public schools of *all* convicted sex offenders, regardless of date of conviction. (*Cf. Augustus* v. *Bean* (1961), *supra,* 56 Cal.2d pp. 270, 272 [4].)

To hold that the act does not apply to convictions suffered before its enactment produces patently absurd and mischievous results. It means that a school employe convicted of a relatively minor sex offense after 1952 must forthwith lose his credential and position upon discovery of the record of conviction, while a procurer, rapist, sodomist or sex deviate, with a teaching credential, whose conviction occurred even one day before the 1952 act became effective cannot be removed under any provision of that act. Further, to give only prospective application to the 1952 amendments makes it appear necessary that similar prospective application be given to the 1955 amendment of section 13130 and the addition of sections 13208, 13219, 13256, and 13587 (Stats. 1955, ch. 874), which provide that "Whenever the holder . . . has been determined to be a sexual psychopath . . ." (§§ 13208, 13219) the state and local boards shall revoke his credential and certificate, and (§§ 13256, 13587) that "No person shall be employed *or retained* in employment . . . who *has been* determined to be a sexual psychopath. . . ." (Italics added.) The latter section is necessarily read by the majority as meaning "who shall after the effective date of this section have been determined," etc. To so apply the 1952 and the 1955 enactments will result in the loss of credential and position by a sexual offender *convicted* after 1952 or by one adjudged a sexual psychopath after 1955, but not by an offender who

escaped conviction between 1952 and 1955 by securing a sexual psychopath determination. (See Welf. & Inst. Code, §§ 5500 et seq.) No such unreasonable and absurd intent should be attributed to the Legislature.

And that the Legislature would have declared that the 1952 act should operate prospectively only, if it had so intended, appears from the language which in 1955 it added to section 12912 when (as then numbered § 12011.7) that section was amended to provide, immediately following the words "Penal Code": "or any offense defined in subdivision 1 of Section 311 of the Penal Code [indecent exposure] *committed on or after the effective date of the amendment of this section made at the 1955 Regular Session by the Legislature. . . .*" (Stats. 1955, ch. 874; italics added.) The fact that this 1955 language (of ch. 874) directing prospective application was limited to only the one designated offense of indecent exposure, as well as that no such language (directing prospective application) was included in the 1955 sections (also found in ch. 874) which extend to sexual psychopaths the program to eliminate sexual offenders from the schools, provides a further affirmative indication of legislative intent that as to the other listed sex offenses (including that of which DiGenova was convicted) the date of commission or conviction was and is immaterial. (See *Bellman* v. *County of Contra Costa* (1960) 54 Cal.2d 363, 368 [1] [5 Cal.Rptr. 692, 353 P.2d 300]; *California Emp. Stab. Com.* v. *Payne* (1947) 31 Cal.2d 210, 213-214 [1] [187 P.2d 702]; *Board of Social Welfare* v. *County of Los Angeles* (1945) 27 Cal.2d 90, 97 [3] [162 P.2d 635].)

In this connection it may be further noted that the Legislature found no difficulty in expressing its intention in specific language in section 290 of the Penal Code, which since 1947 has required the registration of any sex offender "who, *since* the first day of July, 1944, *has been or is hereafter convicted* in the State of California of the offense of . . ." (Italics added.) And as pointed out by defendants, it will be an added absurdity that one convicted between 1944 and 1952 and required to register as a sex offender under that section (Pen. Code, § 290) may nevertheless continue to teach in the public schools, as will occur from refusal to apply retrospectively (i.e., to the conditions which the Legislature found to currently constitute an existing danger) the Educational Code provisions now before us.

Further, the rule is that if courts are doubtful as to the meaning of a statute they should adopt that interpretation which is in accord with the legislative committee reports dealing with the legislation. " 'Committee reports and explanatory statements of members in charge, made in presenting a bill for passage, have been held to be a legitimate aid to the interpretation of a statute where its language is doubtful or obscure.' " (*Southern Pac. Co.* v. *Industrial Acc. Com.* (1942) 19 Cal.2d 271, 275 [1a], 278-279 [2] [120 P.2d 880].) "In the absence of compelling language in the statute to the contrary, it will be assumed that the Legislature adopted the proposed legislation with the intent and meaning expressed by the [Judicial] [C]ouncil in its report." (*Hohreiter* v. *Garrison* (1947) 81 Cal.App.2d 384, 397 [5] [184 P.2d 323].)

Defendants in their brief have referred by title and date to "five comprehensive Reports of the Assembly Subcommittee on Sex Crimes." The Preliminary Report of this subcommittee, issued in 1950, relates in its foreword that "Two small children were murdered by sex fiends in Southern and Central California in the fall of 1949. The publicity of these murders focused the attention of the public upon sex crimes and sex offenders. There was much public opinion that the size of the sex crime problem was such that existing legislation and techniques of control were inadequate," and that the subcommittee was appointed in November, 1949. "It has been demonstrated to the subcommittee that the problem of sex crimes has two major aspects. The first and foremost is the protection of the community from the sex offender." The Preliminary Report then relates, among other things, that (the italics throughout the following quotation being those of the Legislative Subcommittee) : " 'Sex Offender' is a past-tense word; it really means *past sex offenders*. The sex offender is someone who has in the past indulged in sexual conduct for which he was subject to potential prosecution.

"Only a portion of the past sex offenders are *reported sex offenders*. . . .

"Only a portion of the reported sex offenders are *arrested sex offenders*. . . .

"A still smaller portion of the past sex offender group is made up of convicted sex offenders. . . .''

Appended to the 1950 Preliminary Report is a statement of Dr. Alexander J. Stoddard, Superintendent of Los Angeles City Schools, Los Angeles City Board of Education, which includes the following (italics in this quotation are added) :

"The schools should provide a clean, wholesome environment for growing boys and girls. . . .

"There should be a most careful *screening* of all employees, both applicants and *in-service*, with rigid *elimination* of any who manifest or have a *history* of aberrant sexual behavior.

"We try to do this effectively but further precautions are being taken to *discover such histories*. . . .

"Every possible precaution should be taken to provide a program for the early recognition by school personnel of any signs of . . . *deviant sexual behavior*. Adequate provision should be made for the *prevention* of the *repetition of such abnormalities*. . . .·

"Every precaution should be taken to safeguard children from *potential or actual sex criminals*. . . ."

In August 1952, the Assembly Subcommittee on Sex Crimes reported among other things that "A review of the Education Code relating to person[s] convicted of sex offenses in respect to their employment in the Public School System and to certification documents in connection therewith reflects that the laws are not sufficiently clear to assure that such a person could be *prohibited from continuing to be employed* in the Public School System of the State of California. Your *committee unanimously agreed that a person* convicted of a sex offense should not *continue* to be employed in the Public School System. The over-all solution to this problem should be severely handicapped if a convicted employee of the School System is merely allowed to terminate from one school district and to then obtain employment at another school.

*"Accordingly, Assembly Bill No. 31 was passed by the California Legislature* at the First Extraordinary Session, 1952, *and became effective on July 2, 1952.* The text of this law is as follows: . . ." (Italics added.) The text of the act with which we are here concerned (ch. 25) is then *set out in full*, including, of course, sections 13255 and 13586 which provide that persons who "have been convicted" of the specified sex offenses shall not be "employed or retained" in the public school system.

This 1952 report of the Assembly Subcommittee, concurred in unanimously by its members, followed a two-year study of the problem of sex offenses. Yet the carefully studied emphasis of the unanimous committee that " 'Sex offender' is a past-tense word; it really means *past sex offenders*," etc., is coolly brushed aside by the majority. In my view the report, together with the language of the additions to the Education

Code, leaves no doubt that in adopting chapter 25 the Legislature intended to rid the public schools of all convicted sex offenders regardless of whether their conviction occurred before or after the effective date of the act.

As has been hereinabove mentioned, in a strict legal sense application of the 1952 act to DiGenova is not a true retrospective application, and in any event is not unlawful. The subject act is remedial to the end of protecting the children of the public schools. To that end—and to that end alone—it simply designates a class of persons (those convicted of specified sex crimes) all of whom are prohibited from employment in the schools. The common denominator of the class is that each member has been convicted of a defined sex crime. Each of such persons is as a matter of law made ineligible to hold the position of teacher (or certain other positions) in a public school. This classification is reasonable. It applies alike to those previously, and those subsequently, convicted of the specified crime. The mere fact that tenure in a teaching position is held does not make application of the statute unlawful. There is nothing in the Constitution, the statutes or decisional law which precludes enforcement of the classification. In this connection it is noted that at all material times Education Code, section 13269 (or its predecessor § 13007), has provided that ''All employments under the provisions of Sections 1000 and 1001, Sections 13113 to 13116, inclusive, Sections 13252 to 13312, inclusive, Sections 13314 to 13318, inclusive, Sections 13320 to 13326, inclusive, and Sections 13328 to 13337, inclusive, shall be subordinate to the right of the Legislature to amend or repeal Sections 1000 and 1001, Sections 13113 to 13116, inclusive, Sections 13252 to 13312, inclusive, Sections 13314 to 13318, inclusive, Sections 13320 to 13326, inclusive, and Sections 13328 to 13337, inclusive, or any provision or provisions thereof at any time, and nothing herein contained shall be construed to confer upon any person employed pursuant to the provisions hereof a contract which will be impaired by the amendment or repeal of Sections 1000 and 1001, Sections 13113 to 13116, inclusive, Sections 13252 to 13312, inclusive, Sections 13314 to 13318, inclusive, Sections 13320 to 13326, inclusive, and Sections 13328 to 13337, inclusive, or of any provision or provisions thereof.'' The power of the Legislature over the public schools is, of course, held to be plenary, subject only to any constitutional restrictions. (*Hall* v. *City of Taft* (1956), 47 Cal.2d 177, 180-181 [1] [302 P.2d 574].)

It must necessarily be recognized that, as hereinabove suggested, the statute with which we are dealing, which is designed to eliminate sex offenders from the public school system, was not intended nor is it to be considered as punitive legislation directed at exacting further penalties from past offenders. It is not penal in any respect. Rather, as above mentioned, its aim is the protection of the school children from those convicted of, or in the case of sexual psychopaths disposed toward, sex offenses, whether of the nature of rape, sodomy or incest or of the perhaps less serious per se lewd vagrancy of which DiGenova was convicted. As declared in *Bates* v. *Board of Education* (1903) 139 Cal. 145, 148 [72 P. 907], quoted with approval in *Stuart* v. *Board of Education* (1911) 161 Cal. 210, 213 [118 P. 712], "The public schools were not created, nor are they supported, for the benefit of the teachers therein . . . but for the benefit of the pupils and the resulting benefit to their parents and the community at large." Further, of course, "The whole system of legislation regulating the educational machinery is based upon the consideration of the welfare and best interests of the children. The proper regulation of tenure in office and other rights of teachers were also properly considered and regulated, but the fundamental purpose and primary object of the legislature was the consideration of the welfare of the children. This fundamental purpose must not be lost sight of by courts in the construction of legislation dealing with our educational system." (*Knickerbocker* v. *Redlands High School Dist.* (1942) 49 Cal.App.2d 722, 727 [4] [122 P.2d 289], quoted with approval in *McGrath* v. *Burkhard* (1955) 131 Cal.App.2d 367, 377 [4b] [280 P.2d 864]; see also *Goldsmith* v. *Board of Education* (1924) 66 Cal. App. 157, 168 [5] [225 P. 783].)

It may also be mentioned that, as said by this court in *Coca Cola Co.* v. *State Board of Equalization* (1945) 25 Cal.2d 918, 921 [1] [156 P.2d 1], "Although not necessarily controlling, as where made without the authority of or repugnant to the provisions of a statute, the contemporaneous administrative construction of the enactment by those charged with its enforcement and interpretation is entitled to great weight, and courts generally will not depart from such construction unless it is clearly erroneous or unauthorized." See also *Mudd* v. *McColgan* (1947) 30 Cal.2d 463, 470 [4] [183 P.2d 10]. On July 1, 1952, one day prior to the effective date of chapter 25, the attorney general rendered his opinion unequivocally interpreting the 1952 act as operating retrospec-

tively and requiring the revocation of the credentials of a convicted sex offender regardless of the date of conviction and specifically including convictions prior to July 2, 1952. (20 Ops. Atty. Gen. 10.) Defendants have stated both in their briefs and in oral argument before this court that since July 2, 1952, the state board continuously followed the Attorney General's opinion which, as already indicated herein, I believe correctly interprets the legislation in question.

As to the generally recognized duty of this court in construing remedial legislation—and it cannot be doubted that the *1952* amendments to the Education Code are remedial—we said in *Continental Cas. Co.* v. *Phoenix Constr. Co.* (1956) 46 Cal.2d 423, 434 [9] [296 P.2d 801, 57 A.L.R.2d 914], "Such a law [the general automobile financial responsibility law] is remedial in nature and in the public interest is to be liberally construed to the end of fostering its objectives. (See *Wheeler* v. *O'Connell* (1937) 297 Mass. 549 [9 N.E.2d 544, 111 A.L.R. 1038, 1041].) As said by Mr. Justice Heydenfeldt for this court long ago, and still the law, 'The rule of law in the construction of remedial statutes requires great liberality, and wherever the meaning is doubtful, it must be so construed as to extend the remedy.' (*White* v. *Steam-tug Mary Ann* (1856) 6 Cal. 462, 470 [65 Am.Dec. 523] ; see also *Cullerton* v. *Mead* (1863) 22 Cal. 96, 98; *Cormerais* v. *Genella* (1863) 22 Cal. 116, 125; *Davis* v. *Hearst* (1911) 160 Cal. 143, 188 [116 P. 530].)" If we respect these principles in construing automobile financial responsibility laws it would seem that our school children should be entitled to at least equal consideration. (See also *Estate of Patterson* (1909) 155 Cal. 626, 638 [102 P. 941, 132 Am.St.Rep. 116, 18 Ann.Cas. 625, 26 L.R.A. N.S. 654].) The applicability of this principle to the case at bench is emphasized by the fact that the Education Code specifically directs (§ 2) that "its provisions and all proceedings under it are to be liberally construed, with a view to effect its objects. . . ."

In view of what has been related there is no doubt in my mind that the Legislature found that the continuance in employment of theretofore, as well as prospectively, convicted sex criminals in the public schools in any of the designated capacities unnecessarily imposed grave danger to school children. There can be no doubt either that the Legislature had the power to classify such persons as ineligible (immediately and continuingly) for employment in the public school system. Since the Legislature found the present danger of employing

such persons and had the power to direct their forthwith removal, it seems that the majority of this court, by clear implication of their opinion, convict the members of that Legislature of a serious breach of responsibility.

I speak in defense of all the members of the Legislature who participated in the study which preceded, and in enacting, the subject Education Code sections when I say that to me it is perfectly clear from the language they used (and in the circumstances of its use as made manifest by the committee report) that they did *not* intend that the schools should *retain* in employment persons who had previously suffered sex crime convictions of the types enumerated; rather it was their intention that the imminent hazard to the children of employing such persons should be eliminated, whether the convictions. had already occurred or should take place in the future.

Plaintiff relies upon (and the majority cite) *Fountain* v. *State Board of Education* (1958) 157 Cal.App.2d 463, 469-473 [2-7] [320 P.2d 899], in which this court denied a petition for hearing. It is established law that the denial by this court of a hearing ''is not to be taken as an expression of any opinion by this court, or as the equivalent thereof, in regard to any matter of law involved in the case and not stated in the opinion . . . nor, indeed, as an affirmative approval by this court of the propositions of law laid down in such opinion. . . . The significance of such refusal is no greater than this—that this court does not consider that the interests of justice, or the purposes for which the power was given, require its exercise in the particular case.'' (*People* v. *Davis* (1905) 147 Cal. 346, 350 [81 P. 718] ; *In re Stevens* (1925) 197 Cal. 408, 423-424 [241 P. 88].) And as pointed out in *Cole* v. *Rush* (1955) 45 Cal.2d 345, 351, fn. 3 [289 P.2d 450, 54 A.L.R.2d 1137], ''The significance of a denial in any particular case is also to be understood as further qualified by the fact that under the Rules on Appeal a denial may mean no more than that a ground which we deem adequate or impellent for ordering a hearing has not been brought to our attention. (See rule 29, Rules on Appeal.)''

The opinion of the District Court of Appeal in *Fountain*, insofar as relevant to the issue before us, makes an excellent presentation of the basic proposition that statutes are not to be given a retrospective operation unless it is clearly made to appear that such was the legislative intent. As hereinabove stated I am in full accord with that proposition but for the

reasons which I have tried to both elucidate and document am satisfied that here the legislative intent is made clear. Furthermore, as I have emphasized, the character of the legislation in question is remedial (for the protection of school children) not penal (to further punish the sex convict). This point apparently was not adequately, if at all, presented to the District Court of Appeal. I therefore do not find persuasive in this case its final proposition that (p. 473 of 157 Cal.App. 2d) ''As between a construction of the law which would penalize him [the sex convict teacher] without a hearing and one which would afford him a hearing and accomplish the full purpose of the law, the latter is to be preferred.''

Defendants also contend that the issue of retrospective application of the statutes here involved was determined adversely to DiGenova in our earlier opinion (*DiGenova* v. *State Board of Education* (1955), *supra,* 45 Cal.2d 255), and that under the doctrine of law of the case DiGenova is bound by that determination. For the reasons cogently stated in Justice Coakley's opinion prepared for the District Court of Appeal (*supra,* 11 Cal.Rptr. 620), I believe this contention is likewise meritorious.

I would reverse the judgment with directions to the trial court to enter judgment for defendants denying the writ sought.

McComb, J., concurred.