[L. A. No. 25584.   In Bank.   Jan. 15, 1960.]

SUBSEQUENT INJURIES FUND OF CALIFORNIA, Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION and RAYMOND BALDES et al., Respondents.

Stanley Mosk, Attorney General, Gerald F. Carreras, B. Franklin Walker and Richard A. Gadbois, Jr., Deputy Attorneys General, for Petitioner.

Everett A. Corten, Edward A. Sarkisian, Minsky, Garber & Rudof and Joel Rudof for Respondents.

SCHAUER, J.—Petitioner Subsequent Injuries Fund of the State of California (hereinafter called the fund) seeks annulment of an award of compensation payments made against it by respondent Industrial Accident Commission, in favor of respondent Baldes. We have concluded that there is no merit in contentions of the fund that the doctrine of the law of the case compels annulment or that the award is without support in the evidence. The award will therefore be affirmed.

In November, 1953, Baldes, then 48 years of age, while in the employ of respondent Bethlehem Pacific Coast Steel Corporation (hereinafter called Bethlehem), sustained an industrial accident which resulted in the loss of sight in his right eye. After brief hospitalization for this injury he returned to work, but about a month later experienced a recurrence of certain earlier "nervous" symptoms. He became unable to work or to care for himself, and was hospitalized and his condition diagnosed as psychotic. In December, 1954, he filed an application for payments from respondent fund under the

provisions of section 4751 of the Labor Code,[1] in which he alleged that prior to the industrial injury he was "permanently and partially disabled with a mental disease, described as . . . Psychotic depressive reaction manifested by depression, psychomotor retardation, anxiety, worry, transient hallucinations, and delusions, feelings of helplessness, and inability to cope with difficulties, in partial remission," and that the combined disability resulting from the existing industrial condition and the industrial disability due to the injury to his eye was in excess of 70 per cent of total disability.

In November, 1956, the commission found that Baldes had had a previous permanent partial disability, and that the percentage of permanent disability resulting from his industrial injury and the prior nonindustrial disability amounted to 79 per cent of total, of which 46 per cent was attributed to the industrial injury and is not in issue here. An award against the fund was made of additional compensation for the remainder of the combined permanent disability existing after the industrial injury. No evidence was offered before the commission as to whether Bethlehem had knowledge of the prior nonindustrial disability and the commission made no findings upon that issue.

Upon the fund's petition for review, the award against it was annulled and the proceeding remanded in *State of Calif.* v. *Industrial Acc. Com.* (1957), 150 Cal.App.2d 716 [311 P.2d 26], on the authority of previous District Court of Appeal decisions stating or holding that the fund was liable only if the previous disability was or should have been known to the employer. After notice to the employe and failure by him to produce evidence of his employer's knowledge of any preexisting disability, the commission, in August, 1957, denied recovery from the fund.

Thereafter, in *Ferguson* v. *Industrial Acc. Com.* (1958), 50 Cal.2d 469, 475 [2], 477 [8], 479 [13] [326 P.2d 145],

---

[1]Labor Code, section 4751, at the time of Baldes' industrial injury: "If an employee who is permanently partially disabled receives a subsequent compensable injury resulting in additional permanent partial disability so that the degree of disability caused by the combination of both disabilities is greater than that which would have resulted from the subsequent injury alone, and the combined effect of the last injury and the previous disability or impairment is a permanent disability equal to 70 per cent or more of total, he shall be paid in addition to the compensation due under this code for the permanent partial disability caused by the last injury, compensation for the remainder of the combined permanent disability existing after the last injury as provided in this article."

this court held that the subsequent injuries legislation does not require employer knowledge of the preexisting disability to support an award against the fund, and disapproved the contrary holdings or implications of the previous district court of appeal opinions, including the first opinion in this (Baldes) case. The commission then reopened this matter for reconsideration in the light of the Ferguson decision and again made an award against the fund. This second award is now before us for review.

As grounds for annulment, the fund first contends that under the doctrine of the law of the case the commission was bound by the previous ruling of the District Court of Appeal in *State of Calif.* v. *Industrial Acc. Com.* (1957), *supra,* 150 Cal.App.2d 716, 719 [3, 4], that employer knowledge of the preexisting disability was required to support the award against the fund. There is, however, a recognized exception to the doctrine of the law of the case where, as here, there has been an intervening change or clarification in the law. In *Gore* v. *Bingaman* (1942), 20 Cal.2d 118, 122-123 [4] [124 P.2d 17], this court enunciated the rule as follows: "It is true that the law of the case doctrine is a procedural rule which is generally followed, not because the court is without power to reconsider a former determination, but because the orderly processes of judicial procedure require an end to litigation. In the absence of exceptional circumstances of hardship and injustice the need for attributing finality to considered judicial determinations compels adherence to the previous decision. But the rule should never be made the instrument of injustice. Thus, where the controlling rules of law have been altered or clarified in the interval between the first and second appeal and adherence to the previous decision would result in defeating a just cause, it has been held that the court will not hesitate to reconsider its prior determination. (See *England* v. *Hospital of Good Samaritan* [1939], 14 Cal.2d 791, 795 [97 P.2d 813]; 42 Harv.L.Rev. 938.)'' (See also *Standard Oil Co.* v. *Johnson* (1942), 56 Cal.App.2d 411, 415-416 [1] [132 P.2d 910].)

It follows that the law of the case doctrine does not compel annulment of the second award against the fund.

The fund next contends that the record contains no evidence that prior to the industrial injury Baldes was permanently partially disabled within the meaning of section 4751 of the Labor Code as interpreted by this court, so as to

entitle him to fund benefits. This contention, for reasons hereinafter shown, is likewise without merit.

The record shows that in 1949, after 23 years' almost continuous service in the United States Navy, during which Baldes worked primarily in engine rooms, he was discharged to the fleet reserve with the rating of chief engine man. During the next year and a half he had difficulty in obtaining employment but did work at odd jobs. In 1951 he was recalled to active naval service and assigned to teach mechanics. He felt unequal to teaching and developed nervous symptoms, including fear and apprehension, difficulty in swallowing and speaking, and chest pains. He was hospitalized for psychiatric observation for 22 days, then returned to duty as master at arms and had no nervous symptoms during his further Navy service. In January, 1953, he was released from active duty and employed as a maintenance mechanic by Bethlehem. He testified that during his employment by Bethlehem he had no trouble performing his work as a mechanic. On November 6, 1953, he sustained the industrial injury; a sliver of steel entered his right eye, with resultant eventual loss of sight thereof. After overnight hospitalization for this injury he returned to work in about three weeks, but his injured eye "got more and more shady." When it failed to clear up he "started getting scared that it never would," again had nervous symptoms, and about January 1, 1954, became unable to work or to care for himself.

On March 30, 1954, he was again hospitalized, and his condition diagnosed as "Psychotic depressive reaction manifested by depression, psychomotor retardation, anxiety, worry, transient hallucinations and delusions, feelings of helplessness, and inability to cope with difficulties, in partial remission." In November, 1954, he was released from the hospital on a trial basis and was not required to return. However, upon a physician's advice he did not attempt to resume employment and his personality disorder was more serious than it had been before his psychotic break.

The records of the veteran's hospital where the above diagnosis was made state further that as of May, 1954, Baldes' "movements were slow, and throughout the interview he had a vague, humorless smile on his face. He answered questions slowly in a rather low voice and tended to ramble even when asked to change the subject. He shows some evidence of psychomotor retardation, and although there was no definite evidence of depression at this time, he does admit having been

depressed and confused in the past, and of being the type that worries considerably about even minor events. He cannot give a very adequate description of the events which lead up to his admission to either this hospital or Metropolitan State Hospital [from which he had been transferred to the veteran's hospital]. He describes this as 'happening in a dream.'" Baldes was "rated by the Veterans Administration as having incurred his mental illness while in the Armed Forces" and as being entitled to monthly disability compensation since May, 1954. He testified that he had declined such compensation as it would have affected his Naval retirement pension.

The report of Dr. Gordy, a neuropsychiatrist who examined Baldes in June, 1955, and was informed by Baldes and his wife of his previous work and hospitalization experience, includes the following statements: "Between January and November, 1953, patient states he went to work [for Bethlehem], never missed a day, and considered that he was holding a pretty responsible job. He was working mostly on pumps and air compressors. He worked by himself and did his own repairs. On the day of the accident to his right eye, he had been transferred to working with a gang instead of alone and recalls he was extremely reluctant to go to work that day and had a good deal of apprehension and anxiety. When the injury occurred it confirmed psychologically the apprehension that 'something would happen' and apparently began the overt depressive symptoms which ended in the psychotic episode for which he had to be hospitalized. . . .

"Patient is somewhat retarded, anxious and apprehensive. He has difficulty in speaking, and in fact his wife who accompanied him to the office did practically all the talking. During the time that he was working prior to the November 1953 industrial accident she states that he was 'nervous' but that this became much worse in the following few months. During the first acute phase his fearfulness was extreme and he was apparently confused and possibly hallucinating. He had to be bathed and fed and had to be put on the toilet. His weight dropped to 90 pounds. He has improved following a year of hospitalization, but is still very fearful, sits around the house, has difficulty going anywhere. He is afraid he might not get back home. His wife states that he still is fearful of almost everything and has to be watched over. He is eating well and sleeps all night but has many dreams with yelling in his sleep. He has practically no insight into the sources of his emotional

difficulties and exhibits no initiative as far as plans for the future. ...

"CONCLUSIONS: 1) There is no doubt that with the frankly psychotic break of the winter of 1953/54 leading to hospitalization for a year this man has become totally disabled. He has been out of the hospital a few months, but his condition at home is such that his adjustment is scarcely borderline. Any stress would precipitate a relapse. At his present age prognosis is guarded for any recovery sufficient to allow even the most simple gainful occupation.

"2) From a review of all the medical records, including the psychiatric survey from the U. S. Naval Hospital, San Diego (May 1951) and the abstract from [two Los Angeles hospitals], it is apparent that this man has suffered from a life long personality difficulty. However, he was able to make an adjustment while in the Service until he reached the critical fifth decade and until he was given an assignment entailing more responsibility than he could handle.

"He has been rated by the Veterans Administration as having incurred his illness while in Service. I agree that his illness goes back a long time, although not in the severe form of the past year.

"3) From the above, it is my opinion that this man was suffering from a preexisting personality disorder with borderline adjustment and that the industrial injury in November 1953 in which he lost the sight of his right eye aggravated this preexisting disorder so that he has become completely disabled."

In the psychiatric survey of May, 1951, from the United States Naval Hospital (referred to in Dr. Gordy's report), the medical officer states, "This 46 year old Chief was recalled 2-13-51. I have followed him for two months during which time he has profited little from reassurance, change of assignment or surface psychotherapy. He has constantly complained of exhaustion, drawing sensations in the face and chest, epigastric discomfort, dysphagia, nervousness and myriad other complaints. He has total absence of insight and his intelligence seems low. His superiors state his efforts are unproductive even with constant supervision. He cannot teach due to lack of confidence."

Baldes testified that his nervous condition took the form of a nervous stomach, which "came about particularly when ... faced with a new job or a new activity," but disappeared when he found he could handle the job. His wife stated that

he had "always" been depressed and frightened, even before their marriage in 1935.

Dr. Thompson, specializing in neurology and psychiatry, was appointed by the commission as an independent medical examiner. He examined Baldes in June, 1956, "reviewed the extensive file in this case," and reported with respect to the "mental examination," that "the patient is seen to be moderately withdrawn and he shows considerable feeling of inferiority [and] . . . loss of self-confidence. . . . [T]he emotional reaction is primarily one of apathy. There is no evidence of psychotic content; no delusions, hallucinations, or other psychotic manifestations are found. . . . [T]he intellectual resources [are] . . . relatively intact . . ."

Dr. Thompson stated as his opinion that "The diagnostic impression of this patient at the present time is that he is in a remission [recovery] from a schizophrenic psychosis. Review of the records and of the file indicate that his psychotic illness was of depressive nature. . . . It is believed that the diagnosis correctly from the data given in these [hospital] files is that of a schizophrenic reaction. . . . [F]rom the patient's present appearance . . . he appears typically like a person recovered from an episode of schizophrenia . . .

"[T]his patient suffered from a schizoid personality prior to this psychotic break . . . [but not] from mental deterioration on or immediately prior to November 6, 1953, and . . . he does not suffer with true mental deterioration at the present time. His deterioration is primarily that of personality and he shows a moderate degree of this at the present time. It seems probable that he is impaired to the extent of about 25% above his condition prior to the accident of November 6, 1953.

"His present mental condition is not normal and his psychotic break was apparently precipitated by his injury of November 6, 1953.

". . . [M]ental disability did preexist the injury of November 6, 1953, and the same still exists but has been increased by reason of the injury. . . . The percentage of the present mental disability chargeable to the injury . . . is probably 25% or less.

". . . The mental disability has progressed since the injury of November 6, 1953, but only as a result of the schizophrenic phychosis that developed following the injury."

After a later hearing, in September, 1956, at which Dr. Thompson was cross-examined on his report, the parties stipulated that the commission could use and be guided by the

referee's report of the hearing, without the necessity of a transcript.[2] In such report the referee related, among other things, "The doctor had the Commission's file available when he wrote his report. The doctor defined what is meant by schizophrenic psychosis or schizophrenia. At the time of his examination, applicant was in a state of remission [recovery]. He cannot say how long applicant will remain in a state of remission. He would have to be guided by past experience. He found that applicant has no mental or intellectual deterioration but he did find . . . personality disorder or deterioration.

"Patients with personality disorders function better than patients with intellectual deterioration in so far as employment is concerned. The doctor stated that applicant's personality deterioration preexisted but he could not say to what extent. . . . He states that approximately 25% of the present disability should be charged to the injury of Nov. 6, 1953. He is basing this estimate on the degree of recovery that applicant has had from his psychotic attack.

"He would say that at the time of his examination applicant's condition was moderate. He thinks that applicant is able to engage in gainful employment where there is not too much pressure or strain upon his relationship with other people. Applicant could do mechanical work or work involving tools or equipment. He could do work that requires use of judgment . . . The doctor . . . disagrees with . . . [Dr. Gordy's] conclusion . . . that applicant has become totally disabled. . . . It may be due to the difference in time. He saw applicant a year later and he may have improved in that time.

"Stresses and strains could precipitate a relapse.

"The doctor has had many patients suffering from schizophrenia. Twenty-five per cent of these have one attack and then recover; 50% have recurrent attacks with varying degrees of remissions; 25% have one attack which is chronic and do not recover. He thinks that applicant belongs to the 50% category. There is no way of predicting when another attack will occur. Applicant had a serious attack in 1953-54 from which he recovered fairly well, with some residual impairment of personality.

"The doctor found applicant's intellectual resources quite intact. His chief difficulty was impairment of emotions.

". . . The 1953-54 attack that applicant had was the only psychotic attack that he can find in the record. Applicant's

[2]Such testimony has nevertheless been transcribed, appears in the record before this court, and fully supports the report of the referee.

personality defect before the injury of Nov. 6, 1953, was less than it is now but he could not say to what extent. Prior to 1953 applicant had predisposition or receptivity to a major attack. This was a little more than potentiality as he had a schizoid personality. He had actual symptoms. For instance, he had nervousness. The actual psychosis did not come into being until after the injury of 1953. The schizoid personality preexisted for many years before Nov. 1953, but not the psychosis. . . .

"[T]he doctor testified that applicant was somewhat disabled from work before Nov. 1953, by reason of his personality disorder. . . .

"After some discussion the doctor stated that it is his opinion that 25% of the personality disorder that applicant has is due to the injury of Nov. 6, 1953, and that 75% of this disorder preexisted the injury . . . that the present condition is moderate and that the preexisting condition was between slight to moderate."

The commission then requested from its rating bureau a permanent disability rating on combined disability for the industrial blindness and for "Schizophrenia, causing moderate personality disorder and deterioration with inability to do work which causes pressure and strain in connection with applicant's relationship to other people. (*25% of this factor to be charged to effect of aggravation resulting from injury of November 6, 1953.*)" The rating expert, on the basis of specified tables and formulae and the schedule adopted pursuant to section 4660 of the Labor Code, made his recommended ratings. The commission gave the parties notice and opportunity to be heard in objection to the recommendations, they did not object, and the commission accepted the recommendations of a 79 per cent total permanent disability rating, with 46 per cent chargeable to the industrial injury. The commission, in its report denying the fund's petition for reconsideration, declared that Baldes "had a preexisting condition that, if work connected, would have entitled him to a permanent disability rating."

It appears obvious that the above related evidence abundantly supports the commission's finding of permanent partial disability preexisting the industrial injury, and that Baldes' schizophrenic condition interfered with his ability to compete in the open labor market on equal terms with his fellow workers, and was actually symptomatic and work-disabling within the purview of the Labor Code and of this court's

statements in the Ferguson case (*Ferguson* v. *Industrial Acc. Com.* (1958), *supra,* 50 Cal.2d 469, 477 [8]) that the pre-existing disability must be actually "labor disabling," at least to the extent that if industrial it could support an award of permanent disability, although (as held in *Smith* v. *Industrial Acc. Com.* (1955), 44 Cal.2d 364, 367 [2, 3] [282 P.2d 64]) it need not be reflected in the form of loss of earnings. Baldes' ability to carry on some types of gainful work under conditions congenial to his schizoid personality would thus not require a finding that a prior disability did not exist.

The fund urges that Baldes' period of hospitalization in 1951 following his difficulty with his Navy teaching assignment "represents the sole manifestation," prior to his industrial accident, of any personality disturbance, and indicates at most a not abnormal nervousness and psychosomatic response of one confronted with duties beyond his ability, and that the Legislature did not intend by the subsequent injuries legislation to compensate individuals who failed to meet the challenge of a work assignment beyond their experience and natural aptitudes. The fund further argues the effect of various of the other evidence concerning Baldes' work and health history. ■ We think, however, that the interpretation of this period of hospitalization and the events leading up to it, as well as of Baldes' prior and subsequent history, into terms of work disablement are better left for determination by the expertise of the commission, whose facilities for determining facts, like those of a trial judge, are superior to those of a reviewing court. The appraisal of the genuineness of a personality disorder and its disabling effect can be better made by the commission, with its expert independent medical examiners and its referees experienced in such matters and actually confronted with the applicant, than by a court of review.

The fund relies upon the recognized rule that expert evidence is no stronger than the facts on which it is predicated (citing *Winthrop* v. *Industrial Acc. Com.* (1931), 213 Cal. 351, 354 [1] [2 P.2d 142]; *Blankenfeld* v. *Industrial Acc. Com.* (1940), 36 Cal.App.2d 690, 697-699 [1] [98 P.2d 584]; *Mark* v. *Industrial Acc. Com.* (1938), 29 Cal.App.2d 495 [84 P.2d 1071]; *Gamberg* v. *Industrial Acc. Com.* (1934), 138 Cal.App. 424, 428-429 [2] [32 P.2d 413]; *Nielsen* v. *Industrial Acc. Com.* (1932), 125 Cal.App. 210, 212 [1] [13 P.2d 517]). In each of the cited cases there was, however, evidence in direct conflict with the medical opinions which were discounted. By contrast in the present case, no evidence appears which con-

flicts with the medical opinions that Baldes suffered from disabling schizophrenia prior to his industrial injury. We note, further, that in the opinion on the review of the first award to Baldes against the fund (*State of Calif.* v. *Industrial Acc. Com.* (1957), *supra*, 150 Cal.App.2d 716, 719 [4]), the court observed that "the record leaves no room for doubt that the employee had a serious mental condition preexisting the industrial injury. During Navy service, Mr. Baldes had been hospitalized for neuropsychiatric survey, and had been rated by the Veterans Administration as having incurred his mental illness while in the Armed Forces." It was upon the same record that the commission again made an award against the fund.

For the reasons above stated, the award is affirmed.

Gibson, C. J., Traynor, J., Spence, J., McComb, J., Peters, J., and Tobriner, J. pro tem.,* concurred.

Petitioner's application for a rehearing was denied February 10, 1960. Tobriner, J. pro tem.,* participated therein in place of White, J., who deemed himself disqualified.

*Assigned by Chairman of Judicial Council.